In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3084

FARAJI OMAR GARTH,

*Petitioner-Appellee,*

*v.*

CECIL DAVIS, Superintendent
of the Indiana State Prison,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 04 C 595—**Allen Sharp**, *Judge.*

ARGUED FEBRUARY 21, 2006—DECIDED DECEMBER 11, 2006

Before BAUER, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* Faraji Omar Garth ("Garth") was
convicted of robbery and of being an accomplice to at-
tempted murder. The State alleged that Garth and his
brother, Ahman Garth ("Ahman"), along with two others,
robbed a convenience store and attempted to kill the clerk.
After his conviction was affirmed on direct appeal, Garth
filed a petition for relief in federal court under 28 U.S.C.
§ 2254 claiming that the jury instruction given at the
state trial, regarding attempted murder, violated due
process. The district court granted Garth's petition. We
believe that § 2254 relief was improvidently granted, and
therefore, reverse.

## I. HISTORY

*A. State's Evidence*

At Garth's trial, the State presented evidence supporting the following facts. Late in the evening on August 21, 1997, Garth, his brother Ahman, and two other men entered the convenience store of a gas station in Evansville, Indiana. Garth frequently came to this store so the employee on duty, James Hardy, recognized him as a customer. But Garth and his cohorts had no intention of buying anything this night. As Hardy later testified to at Garth's trial, Ahman quickly brandished a gun and attempted to rob the store. A car pulling into the parking lot startled the robbers and Ahman ordered Hardy to turn the store's lights off at the circuit breaker. To show that he meant business, Ahman hit Hardy in the back of the head with the gun. Hardy got the message and disengaged the circuit breaker. The lights went off, but an unintended consequence was that Hardy could no longer open the electronic cash register.

As Hardy testified to at trial, Ahman then forced Hardy into a back room, believing a safe was there. While in that room, Ahman again hit Hardy with the gun, knocking him unconscious. Hardy awoke to the men punching and kicking him. Hardy testified that Garth was one of the men beating him, but also said he could not be sure. Hardy then testified that Ahman forced him into a chair, put the gun to his head and pulled the trigger. The gun did not fire. Twice Ahman removed the gun's magazine, banged it on a table, placed it back into the gun, and tried to shoot Hardy in the head. Fortunately, the gun would not fire. After the third pull of the trigger, the police arrived and the robbers fled. Ahman was quickly arrested in front of the store after dropping his gun, which was recovered. Garth got away but was later arrested and identified by Hardy.

Part of the State's evidence was Garth's testimony at the earlier trial of codefendant Leo Johnson. At Johnson's trial, as the jury in Garth's trial heard, Garth admitted that he planned to rob the convenience store along with his brother and two other persons. At Johnson's trial, Garth also admitted that Ahman pointed a gun at Hardy's head.

### B. Defendant's Testimony

Garth testified at trial, and his testimony is essential to our resolution of this appeal. Therefore, we will recite it in detail, including all references to his intent the night of the crime, as well as all references to any attempt to kill Hardy. To begin, his testimony at Johnson's trial provided some difficulties for Garth because he now wanted to say that Ahman did not point a gun at Hardy's head. He explained to the jury that when he testified at Johnson's trial he lied in part in the hope of pleasing the State and garnering a deal.[1] He further explained that a portion of his testimony regarding Ahman attempting to kill Hardy was a lie. According to Garth:

> So upon testifying, I gave them the statement that said my brother did point the gun at the witness, and that is untrue.

---

[1] The State and Garth discussed a plea deal, but it is clear that the testimony at Johnson's trial was not part of it. Garth told his jury that the State rejected his deal, "even though [Garth] had already gave them, basically, what they wanted." S.C.R. at 625. But apparently the State did not want Garth to testify *on behalf* of Johnson—not at the request of the State—and to the effect that Johnson was in no way involved with the robbery. The State maintained that Johnson was part of the robbery and attempted murder. It appears the State withdrew any plea deal because of Garth's testimony at Johnson's trial, which the State believed to be false.

S.C.R. at 625.

After further testimony about why Garth lied under oath, Garth and his attorney engaged in the following colloquy:

Q: Did you ever . . . were you present in a back room at a time when Ahman . . . was pointing and clicking a gun at Mr. Hardy's head?

A: I testified that I was, but in truth, it never happened. My brother never tried to kill that man.

Q: Is there anything else that you would like to tell the Court, and the jury, or us at this time?

A: I'll admit that I was there, and I did agree to rob the store with my brother and two friends of mine, that I was there when money was taken, and I was there when the witness was attacked, but I didn't lay my hands on that man, and also, my brother didn't try to kill that man. What that man's saying is not true.

S.C.R. at 626-27. This concluded Garth's testimony on direct.

On cross-examination, the State began by attacking Garth's credibility, and confirming Garth's admission that he, Ahman, and two others robbed the convenience store. Garth also admitted that he would be easily recognized by Hardy:

Q: In fact, James Hardy, the clerk that night, had waited on you many, many times, isn't that true?

A: Yes. It is.

Q: So many times that you could recognize him, and he could recognize you, isn't that true?

A: Yes. He could. And yes. I could.

S.C.R. at 633. The cross-examination then turned to Ahman's use of a gun:

Q: You testified in the Leo Johnson trial that before you went to rob the store, you knew your brother, Ahman, had a gun, isn't that true?

A: Yes. I did.

. . .

Q: In fact, you were shown . . . Exhibit 8?

A: Yes. Just like that. Yes.

Q: You identified [Exhibit 8] as the gun your brother had, at that trial, true?

A: Yes. It was.

Q: You knew your brother, Ahman, was bringing the weapon into the store before you committed the robbery, isn't that true?

A: Yes. He did tell me he had a gun.

Q: And once inside the store, you did see your brother holding the gun, didn't you sir?

A: Yes. I did.

Q: And in fact, once inside the store, you saw him displaying the gun throughout the store, isn't that true?

A: No. I testified that he did, but he pointed it to him, and told him to get into the back. That was the only time he pointed a gun at that man.

Q: I couldn't hear you. What's that?

A: The only time he pointed the gun at that man was when he told him to get into the back. That was all. It was basically around his waist area.

Q: So you're admitting to this jury, today, that you saw your brother point the gun at James Hardy, isn't that correct?

A: Yes. He did point the gun at him, or in his general direction.

Q: And in fact, sir, isn't it true that you saw him point it at James Hardy's head in the back room?

A: No. It is not true.

S.C.R. at 635-37. The State then impeached Garth with his testimony at Johnson's trial where Garth related that he saw the gun pointed at Hardy's head. When asked why he made that statement, which he now denied, Garth answered:

A: Yes. That was a statement that was necessary in order for the Judge to accept my plea, so I gave it. I lied under oath.

S.C.R. at 637. After some discussion of why Garth was willing to plead guilty to attempted murder and robbery, the following colloquy occurred:

Q: And you walking into a trial of Leo Johnson, and said you saw your brother try to kill James Hardy, but today you're telling this jury that you didn't see your brother kill James Hardy, is that correct?

A: I told them . . .

Q: Or try to kill him?

A: Yes. I told the Court that I did see him point the gun at his head, which was untrue. He never did that.

S.C.R. at 642. The State then moved on to who Garth's two friends were, but Garth maintained that he did not know the identities of the two men he and his brother robbed the store with because he only knew their nicknames.

Garth's counsel then began re-direct, attempting to elicit why Garth was initially willing to plead guilty. Garth answered:

A: At the time, it was all . . . I was all concerned about the time. The time was a big deal, but now I can't sit here and say that my brother tried to kill this man, because it's not true, and I'm willing to take the risk now to go to trial, and prove so.

S.C.R. at 650. Garth's counsel then concluded his re-direct with the following colloquy, focusing on Garth's intent on the night of the robbery:

Q: Was it your intention, at any time, to harm the attendant at the store?

A: No. I never touched that man.

Q: Would you have taken part in that robbery if anyone else had voiced intention to you about murdering this attendant?

A: No.

S.C.R. at 651. The State's re-cross immediately focused on Garth's love for his brother, and quickly concluded:

Q: And you're telling us today that your brother never tried to kill that man, James Hardy, isn't that true?

A: Yes.

S.C.R. at 653.


## C. Closing Arguments

During closings, neither the State nor Garth focused on intent. Garth's counsel attempted to point out inconsistencies, including those in Hardy's testimony:

How can you click a gun that's got a live round in its chamber, that's cocked, it's loaded like this, and nothing's going to happen with it, and then Mr. Hardy says he heard that three times, you know, and was sure about the sound that he heard. I just don't think it's

possible. I don't know what he heard back there at that, but I don't think he heard somebody clicking that gun three times at his head. I think it's probably fortunate that he didn't hear that. Very fortunate, because then we . . . he wouldn't be here, and that would be unfortunate. What happened was unfortunate, but what's even more unfortunate of this whole scenario is the fact that the only evidence we have that hinges this . . . the attempted murder charge of this young man over here is Mr. Hardy's confused recollection of what went on that night.

S.C.R. at 677.

Garth's counsel then responded to the State's assertion that Garth never tried to stop Ahman from shooting Hardy:

Well, I submit to you that you can't have negative acquiescence to something that didn't happen. You can't try to stop someone from clicking a gun if that gun didn't click. He pointed the gun at him. Pointed the gun at him is not attempted murder . . . you can't stop something that is either not happening, just doesn't exist . . . .

S.C.R. at 678.

Garth's counsel then argued that it would make no sense to try to kill Hardy before any money was recovered and that no bullets or spent casings were recovered from the store. As to intent, he argued the following:

We've got . . . they'll instruct you about intent and knowingly. Heavy, heavy burdens that you've got there when you start to analyze those. What constitutes the actual intent of this, I don't know, but you know, there was . . . I don't think there was any intent there ever, on the part of anybody, certainly not

on the part of [Garth] over here in that, except for the intent to maybe commit a robbery. . . .

S.C.R. at 680.

In rebuttal, the prosecutor remarked, among other things:

The only thing that this Defendant disputes is whether his brother actually pulled the trigger when it was held to James Hardy's head. That's the only thing. Everything else is proven beyond any doubt.

S.C.R. at 689. The prosecutor also focused on "one fact out here that screams out in this case":

Why would somebody go into a store, in their neighborhood, and try to rob a clerk that they knew, with no mask on his face? Why would somebody do that? You are sure to be caught. No one in this robbery wanted to be caught, did they? You're not going to get caught if you murder the guy. There's not going to be any witnesses then. That fact cries out, and tells you, compels you, to the conclusion that you knew from the beginning they were going to kill James Hardy. If they weren't, they would have gone somewhere else. They would have worn a mask. They wouldn't walk in there to just get caught.

S.C.R. at 692-93.

### D. Jury Instructions

The Judge then instructed the jury. These instructions form the basis of Garth's argument on appeal. Therefore, we will recount the relevant portions:

Court's Final Instruction No. 1

COUNT I

The State of Indiana has alleged that the defendant [Garth], . . . did intentionally attempt to commit the crime of knowingly killing James Hardy, . . . by intentionally pointing a loaded [gun] at the head of the said James Hardy and repeatedly pulling the trigger . . . .

S.C.R. at 695.

Court's Final Instruction No. 2

The crime of attempted murder . . . is defined by statute as follows:

A person who knowingly or intentionally kills another human being commits murder, a felony. A person attempts to commit murder when, acting with the culpability required for commission of the murder, he engages in . . . a substantial step. . . .

To convict the defendant, [Garth], . . . the State must have proved each of the following elements:

The defendant

1. on or about August 21, 1997,

2. acting with the specific intent to commit murder, to-wit: knowingly killing James Hardy,

3. did intentionally point a loaded [gun] at the head of the said James Hardy and repeatedly pull the trigger . . . .

If the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant not guilty.

If the State did prove each of these elements beyond a reasonable doubt, you should find the Defendant guilty of the crime of attempted murder . . . .

S.C.R. at 696-97.

### Court's Final Instruction No. 5

Attempt is a crime of specific intent, that is, it must be done with the intent to commit the alleged felony. Specific intent is a material element of the crime charged, and must be proven by the State beyond a reasonable doubt. In laymen's terms, intent means a person's purpose or state of mind at the time he engages in the alleged criminal act.

Since one's purpose and/or intent are subjective facts, the State is not required to make proof of specific intent by direct evidence. Therefore, in order to determine the defendant's purpose and/or intent, you may look to all of the surrounding circumstances, including what was said and done at the time of the alleged criminal act. A determination of the defendant's intent may be arrived at by the jury from a consideration of the defendant's conduct and from the facts and circumstances surrounding the alleged criminal act.

S.C.R. at 700.

### Court's Final Instruction No. 11

A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense.

To 'aid' under the law is to knowingly aid, support, help or assist in the commission of a crime. It is knowingly doing some act to render aid to the actual perpetrator of the crime, though without taking a direct share in its commission.

S.C.R. at 706.

### Court's Final Instruction No. 12

The Court instructs you that it is the law in Indiana that a person engaged in the commission of an unlawful act is legally responsible for all the consequences

which may naturally or necessarily flow from it. If he combines and confederates with others to accomplish an illegal purpose, he is liable criminally for everything done by his confederates which flows incidentally from the execution of the common design as the natural and probable consequences of the common design. This rule of criminal responsibility for the acts of others is subject to the reasonable limitation that the particular act or acts of one member of a party, for which the other associates and confederates are held to be liable, must be shown to have been done in furtherance or in prosecution of the common object and design for which the persons combined together.

S.C.R. at 707.

### Court's Final Instruction No. 14

An accomplice does not need to commit each element of an offense if the accomplice acts in concert with another individual who commits the requisite acts. The acts of one accomplice are imputed to all other accomplices.

S.C.R. at 709.

## II. ANALYSIS

Garth's argument is that the jury instructions had the effect of relieving the state of the burden to prove each element of the charged offense violating the Due Process Clause of the Fourteenth Amendment. *See United States v. Gaudin*, 515 U.S. 506, 511 (1995) ("The Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged . . . ."). Garth argues that because the jury instructions in his case can be reasonably read as requiring only a mens rea relating to knowledge for

attempted murder, those instructions relieved the State of the need to prove specific intent. It is undisputed, at least before us, that specific intent to kill (on the part of an accomplice) is an element of aiding an attempted murder in Indiana. *See Bethel v. State*, 730 N.E.2d 1242, 1246 (Ind. 2000) (explaining that "to convict for the offense of aiding an attempted murder, the State must prove: (1) that the [principal] acting with the specific intent to kill [took a substantial step], and (2) that the defendant, acting with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused the [principal] to commit . . . attempted murder"). *Bethel* was decided after Garth's trial, but the Indiana Supreme Court has made clear that "*Bethel* did not announce a new rule of criminal procedure but rather explained what the State was already required to prove to gain a conviction for attempted murder under a complicity theory." *Williams v. State*, 737 N.E.2d 734, 740 n.16 (Ind. 2000).[2] We will assume that this theory would require habeas relief, if supported by the record.[3]

---

[2] We note that the Indiana Supreme Court has reaffirmed, in the context of discussing *Bethel*, its longstanding precedent that an accomplice is liable for all acts committed by a confederate in furtherance of a common plan. *Williams*, 737 N.E.2d at 739. As the Indiana Supreme Court explained, "[i]n the typical attempted murder prosecution involving an armed robbery or some other criminal enterprise gone awry, the accomplice is criminally liable for the acts done by [the accomplices'] confederates which were a probable and natural consequence of their common plan, and the intent to kill is properly inferred from the . . . shooting principal." *Id.* (citations and quotations omitted). The State does not argue to us that this theory of criminal liability would independently support Garth's conviction for attempted murder.

[3] We will address Garth's argument on the merits and not consider the State's procedural default argument.

Our review of Garth's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). For purposes of this case, the AEDPA only allows habeas relief if the state court decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) (quoting 28 U.S.C. § 2254(d)(1)). The relevant state court decision is that of the last state court to address the claim on the merits. *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003).

A state court decision is contrary to the Supreme Court's "precedent if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law," or, "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (citing *Green v. French*, 143 F.3d 865, 869-70 (4th Cir. 1998)). A decision applying the correct legal rule to the facts of a case is not "contrary to" within the meaning of § 2254(d)(1). *Id.* at 406.

An application of the correct legal rule can be unreasonable, however, within the meaning of § 2254(d)(1). *Id.* at 407-08. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. A state court decision is not unreasonable simply because the court applied federal law incorrectly. *Id.* at 410 ("For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.").

Garth assumes that the Indiana Appellate Court's fundamental error review of his jury instruction claim—

performed in the context of considering whether prejudice existed for alleged ineffective assistance of counsel—acted as an "adjudication on the merits" for purposes of the AEDPA. *See Garth v. State*, No. 82A01-0309-PC-367, slip op. at 5 n.1 (Ind. Ct. App. Apr. 15, 2004). We will do the same. Garth argues that this holding is contrary to federal law in that the Indiana Court of Appeals applied a test contrary to that of the Supreme Court's precedent. Garth also argues, in the alternative, that the court's application of the law was unreasonable.

Garth claims that the clearly established Federal law contradicted by the Indiana Appellate Court is the Supreme Court's direction to query whether there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). We note from the outset that "[a] state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [the Supreme Court's] opinions." *Charlton*, 439 F.3d at 374 (quoting *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam)). "A state court need not even be aware of Supreme Court precedent 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Id.* (quoting *Mitchell*, 540 U.S. at 16).

The Indiana Appellate Court evaluated Garth's jury instructions under a "fundamental error" standard, which, in this context, caused that court to ask whether the instructions "sufficiently informed the jury of the specific intent requirement for attempt." *See Smith v. State*, 792 N.E.2d 940, 944 (Ind. Ct. App. 2003). "There is no fundamental error if the instructions as a whole adequately inform the jury that they must find the defendant had the specific intent to kill." *Id.* (citations and quotations omitted).

The question for us, then, is whether the use of the fundamental error standard as explained above constitutes a legal conclusion opposite that of the Supreme Court's. We think not. Garth argues that querying an instruction's "adequacy" is contrary to considering whether there exists a "reasonable likelihood" it was used unconstitutionally. He buttresses this argument by assuming, without citation or further elaboration, that "adequate" as used by the Indiana Appellate Court is a standard equivalent to that of preponderance of the evidence. There is no support for that conclusion in Garth's case.

In any event, Garth's focus on Supreme Court precedent in this area is too narrow. The Court has made clear that the initial question regarding jury instructions "is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). When answering this question, the Court has further explained, instructions "must be considered . . . as a whole," *id.*, and, finally, ambiguous instructions should be considered under the "reasonable likelihood" standard cited by Garth. *Id.* (citing *Boyde v. California*, 494 U.S. 370, 380 (1990)).

The reasoning of the Indiana Appellate Court was to concede that Instruction No. 11, the accomplice liability instruction, was erroneous because it failed to "inform the jury that 'in order to convict, it was required to find that [Garth] intended to kill [Hardy] *when he took the steps that helped [the gunman] to [attempt to] kill him.*'" *Garth*, slip op. at 8 (emphasis in original) (quoting *Hopkins v. State*, 759 N.E.2d 633, 638 (Ind. 2001)). Nevertheless, the Indiana Appellate Court went on to consider that Instruction No. 2, the attempted murder instruction, and Instruction No. 5, the attempt instruction, both made clear that specific intent needed to be proved beyond a reasonable

doubt.[4] Based on the instructions as a whole, the Indiana Appellate Court found that the jury was adequately informed of the need to find specific intent beyond a reasonable doubt, and never considered whether a specific instruction was ambiguous. This approach does not contradict clearly established Federal law. *See, e.g.*, *Canaan v. McBride*, 395 F.3d 376, 388 (7th Cir. 2005) ("[W]e must determine whether the jury instructions in [this] case, read as a whole, failed to instruct the jury in an element of [the crime] thereby relieving the State of its obligation under the Due Process Clause to prove beyond a reasonable doubt every element of the offense.").

The decision of the Indiana Appellate Court might still be unreasonable, but only if it is objectively unreasonable and not merely incorrect. *Williams*, 529 U.S. at 409-10. It was not objectively unreasonable to conclude that the error in Instruction No. 11 was sufficiently mitigated by Instructions Nos. 2 and 5. Instruction No. 5 clearly states, "Attempt is a crime of specific intent," and Instruction No. 2 states that the jury must find beyond a reasonable doubt that Garth acted "with specific intent to commit murder."

Admittedly, the instructions are far from perfect. Instruction No. 2 defines the mens rea for murder as

---

[4] More specifically, the Indiana Appellate Court found there was no "compound error," which would be a failure to inform the jury that attempted murder requires specific intent *and* a failure to inform the jury that a non-shooting accomplice must have specific intent to kill to be an accomplice to attempted murder. Where such "compound error" exists, the Indiana Supreme Court has required post-conviction relief. *See, e.g.*, *Williams*, 737 N.E.2d at 739-41 ("Because we cannot say that Williams did not suffer harm as a result of the compound error associated with not instructing the jury as to specific intent of either principal or accomplice, we vacate Williams's conviction under an accomplice liability theory for attempted murder.").

"knowingly or intentionally," and then states that the mens rea for attempted murder is the same. And, where the instruction requires the proper mens rea, it states: "acting with the specific intent to commit murder, to-wit: knowingly killing James Hardy." We are also concerned with the effect Instructions Nos. 12 and 14 may have had, given that they recite a concept of accomplice liability not requiring specific intent. *See Williams*, 737 N.E.2d at 739. Nevertheless, consideration of these complications does not change our conclusion that the Indiana Appellate Court was not objectively unreasonable in determining that the jury instructions comported with due process.

Any doubt we might have as to the reasonableness of the Indiana Appellate Court's ruling is allayed by the harmlessness of the alleged error. Our consideration of this issue is made more difficult because the state did not distinctly raise harmlessness. *See Jenkins v. Nelson*, 157 F.3d 485, 494 n.1 (7th Cir. 1998). But we have "discretion to overlook a party's failure to argue harmlessness." *Jenkins*, 157 F.3d at 494 n.1 (citing *United States v. Jewel*, 947 F.2d 224, 228-29 n.5 (7th Cir. 1991)). We will exercise that discretion here because the trial record is clear that Garth's intent was never seriously in dispute. We also note that Garth addressed the issue throughly in his brief.

In a habeas proceeding, an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Jenkins*, 157 F.3d at 494 (quoting *California v. Roy*, 519 U.S. 2 (1996) (per curiam)); *see also Brecht v. Abrahamson*, 507 U.S. 619, 639-44 (1993) (Stevens, J., concurring). If we are in "grave doubt" as to whether the error had such an effect, the conviction must be reversed. *Id.*[5]

---

[5] We have noted Garth's argument that the State bears the burden on this issue. The Supreme Court has been clear that the

(continued...)

Any error in instructing the jury as to the intent required to convict Garth of attempted murder was harmless. The reason is that Garth's intent was never seriously disputed at trial. The dispute at trial centered on whether Ahman actually tried to kill Hardy. Garth affirmatively testified three times that Ahman did not try to kill Hardy, and went so far as to call Hardy a liar. *See* S.C.R. at 626 ("My brother never tried to kill that man."); *id.* at 627 ("[M]y brother didn't try to kill that man. What that man's saying is not true."); *id.* at 650 ("I can't sit here and say that my brother tried to kill this man, because it's not true . . . .").

Garth also denied five times the truth of his previous testimony that Ahman pointed a gun at Hardy's head. *See id.* at 625 ("I gave them the statement that said my brother did point the gun at the witness, and that is untrue."); *id.* at 637 ("Q: And . . . isn't it true that you saw [Ahman] point [the gun] at James Hardy's head in the back room? A: No. It is not true."); *id.* ("That was a statement that was necessary in order for the Judge to accept my plea, so I gave it. I lied under oath."); *id.* at 642 ("Yes. I told the Court that I did see [Ahman] point the gun at [Hardy's] head, which was untrue. He never did that."); *id.* at 653 ("Q: And you're telling us today that your brother never tried to kill that man, James Hardy, isn't that true? A: Yes.").

The issue of Garth's intent only came up during two consecutive questions on re-direct, when his attorney asked about it. *Id.* at S.C.R. at 651 ("Q: Was it your intention, at any time, to harm the attendant at the store?

---

[5]  (...continued)
effect of that burden is to tip the scales in favor of finding error when a judge is in grave doubt as to harmlessness. *See O'Neal v. McAninch*, 513 U.S. 432, 436-38 (1995).

A: No. I never touched that man.") ("Q: Would you have taken part in that robbery if anyone else had voiced intention to you about murdering this attendant? A: No.").

Moreover, the closing arguments did not focus on the issue of Garth's intent. Garth's counsel argued to the Jury that Hardy's account of the attempted murder was implausible, *id.* at 677-78, while pointing out other perceived inconsistencies supporting reasonable doubt. And when he did raise the issue of intent, he did so by arguing that none of the alleged criminals had the intent to kill Hardy. *Id.* at 680 ("I don't think there was any intent there ever, *on the part of anybody*, certainly not on the part of [Garth] . . . except for the intent to maybe commit a robbery. . . . ") (emphasis added). The presentation of the evidence lead the State in rebuttal to tell the jury that "[t]he only thing [Garth] disputes is whether his brother actually pulled the trigger when it was held to James Hardy's head. That's the only thing." *Id.* at 689. And as to Garth's intent, the State argued that the fact Garth and Ahman would rob the store without masks knowing that Hardy could easily identify them "cries out, and tells you, compels you, to the conclusion that you know from the beginning they were going to kill James Hardy." *Id.* at 692-93.

We are not in grave doubt as to whether the presence of the word "knowingly" in Instruction No. 2, and the absence of the proper "specific intent" language in the other instructions, "had substantial and injurious effect or influence in determining the jury's verdict." *Jenkins*, 157 F.3d at 494. We might have thought differently if Garth's testimony and theory of defense were that an attempted murder did occur, or might have occurred, but he never imagined that would happen as he was only on board for a robbery. Garth's defense, however, was that Ahman never tried to kill Hardy. This case came down to a credibility determination between Hardy and Garth, and

the jury chose not to believe Garth. Because any error was harmless, Garth's conviction for attempted murder stands. *Id.*

## III. CONCLUSION

Accordingly, the decision of the district court granting Garth's § 2254 petition is REVERSED.

ROVNER, *Circuit Judge,* dissenting. Faraji Garth concedes that he committed an appalling crime, a dangerous armed robbery that, of course, put people's lives at risk. It is tempting, therefore, to gloss through the weighty procedural details of habeas corpus review on the path to denying relief for this confessed armed robber. The protections afforded by our Constitution, however, work only if they are followed faithfully and meticulously as to each crime for which a defendant is accused without regard to guilt or innocence on other counts of the indictment. On the other side of the coin, federal habeas corpus law provides a very narrow scope of review and relief, and has been further restricted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). In particular, principals of comity, federalism, and judicial efficiency preclude the federal courts from reaching the merits in a habeas case when the claim was presented to the state courts and the state court ruling against the habeas petitioner was based on independent and adequate state-law procedural grounds. *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). Garth asked the federal district court to do just that—to grant habeas relief on his

freestanding claim that the jury instructions contained an incorrect mens rea requirement. The state argued, correctly, that this freestanding claim was barred from review by procedural default. The majority, however, states that it will address these argument on the merits without considering the State's procedural default argument. *Ante* at 13, n.3. Although it may seem economical to jump straight to the merits of Garth's freestanding claim of jury instruction error—particularly where the merits of this claim are so intertwined with Garth's still viable ineffective assistance of counsel claim—we cannot abandon principals of comity and federalism for the sake of economy. Garth's freestanding claim of jury instruction error is ineligible for federal habeas corpus relief because he failed to comply with Indiana's procedural rule that requires such claims to be raised on direct appeal. Garth raised his claim about the mens rea error for the first time in his post-conviction relief proceedings. In Indiana, post-conviction courts do not provide a petitioner with a "super appeal." *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001). Indiana allows petitioners to address only a narrow range of issues in post-conviction proceedings, and a petitioner otherwise waives any issues not raised on direct appeal. (*See* Ind. Post-Conviction Rule 1). Garth's post-conviction appeals (hereinafter "PCA") court properly concluded that these claims were waived. (PCA Decision at 5) (R. at 27, Ex. J to Ex. A, p. 5, n.1). Garth has not asserted any of the equitable doctrines that allow a federal court to consider a claim on the merits notwithstanding a procedural default in the state courts. *See Perruquet*, 390 F.3d at 514-15. Consequently, the majority errs by addressing Garth's claims on the merits where the Indiana PCA court dismissed his claim on an independent and adequate state procedural law ground.

Although this court cannot address the merits of the underlying claim of jury instruction error, we can examine

Garth's claim of ineffective assistance of counsel, as Garth did pursue this claim through one complete round of state post-conviction review. This claim necessarily requires us to look at possible error in the jury instructions; the same error, in fact, that Garth asks us to review directly. It would be a mistake, however, to assume that our review of the jury instructions in the context of an ineffectiveness claim is equivalent to a direct review of the question of jury instruction error. Claims of ineffective assistance of counsel are bounded by the requirements of *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny, which instruct that to make a showing of ineffective assistance of counsel, a petitioner must demonstrate first that counsel's performance was objectively unreasonable, and second that the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687-88; *United States v. Best,* 426 F.3d 937, 945 (7th Cir. 2005). "Our review of the attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004). For the second prong—establishing prejudice—the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

On top of the requirements of *Strickland*, federal habeas law adds an additional hurdle. It is not enough that Garth show that his counsel was ineffective. As the majority describes, under the AEDPA, Garth must demonstrate that the state court's decision holding otherwise was "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States; or [ ] resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1). "A state court decision is contrary to clearly established federal law when the state court applies a rule that contradicts the governing law set forth by the Supreme Court or, on facts materially indistinguishable from the facts of an applicable Supreme Court precedent, reaches a different result." *Goodman v. Bertrand*, 467 F.3d 1022, 1026 (7th Cir. 2006) (internal citations omitted).

Under the AEDPA, therefore, Garth must demonstrate that the Indiana Appellate Court, on post-conviction review, unreasonably applied *Strickland* in evaluating Garth's ineffective assistance claim. Unlike the majority, I would find that the PCA court's application of *Strickland* was not only wrong, but objectively unreasonable.

The majority agrees, as it must, with the PCA court and with Garth that at the time of Garth's trial, Indiana law on accomplice liability for attempted murder required the state to prove that the accomplice had the specific intent that the killing occur. *See Williams v. Indiana*, 737 N.E.2d 734, 739, 740 n.16 (Ind. 2000) (explaining that, in order to gain a conviction for attempted murder as an accomplice, the state has always been required to prove that the accomplice had the same specific intent as the principal); *see also Bethel v. State*, 730 N.E.2d 1242, 1246 (Ind. 2000); *Woodson v. State,* 767 N.E.2d 1022, 1028 (Ind. Ct. App. 2002) *confirmed on reh'g,* 778 N.E.2d 475 (Ind. Ct. App. 2002); (PCA Decision at 8) (R. at 27, Ex. J to Ex. A, p. 8). The PCA court, the district court below, both parties, and the majority of the panel on this appeal agree, furthermore, that jury instruction number eleven was erroneous

because it failed to instruct the jury that in order to convict it had to find that Garth intended that Hardy would be killed. (PCA Decision at 8) (R. at 27 Ex. J to Ex. A, p. 8; (D. Ct. decision at 4); (Brief of Respondent-Appellant at 12-13); (Brief of Petitioner-Appellee at 16); *ante* at 13, 17-18. In fact that instruction specifically used the words "knowingly **or** intentionally." (R. at 20, p. 706) (emphasis added). In short, the law required intent; the jury instruction allowed for conviction on mere knowledge; and yet Garth's attorney remained silent voicing no objection to this key error. This alone would constitute an objectively unreasonable performance, but as I will describe in further detail in a moment, counsel's failures went much further.

The PCA court, with which the majority agrees, concluded that the error in instruction number eleven was mitigated by the instructions as a whole, which later informed jurors, in instruction number five, that "attempt is a crime of specific intent." (PCA Decision at 10) (R. at 27 Ex. J to Ex. A, p. 10); *ante* at 17. Read in full that instruction states:

> Attempt is a crime of specific intent, that is, it must be done with the intent to commit the alleged felony. Specific intent is a material element of the crime charged, and must be proven by the State beyond a reasonable doubt. In laymen's terms, intent means a person's purpose or state of mind at the time he engages in the alleged criminal act.

(R. at 20, p. 700). This instruction certainly does describe the requisite mens rea required for attempted murder, but fails to clear up the confusion over the mens rea requirement for an accomplice to attempted murder. To understand why this distinction is important, we must first understand how the law of accomplice liability and attempt intersect in Indiana. Under Indiana law, in order

for the state to secure a conviction for attempted murder as an accomplice, the state is required to prove, "(1) that the [principal], acting with the specific intent to kill, took a substantial step toward the commission of murder, and (2) that the defendant [accomplice], acting with the specific intent that the killing occur, knowingly or intentionally aided, induced or caused the [principal] to commit the crime of attempted murder." *Williams*, 737 N.E.2d at 739. For our purposes, I find it helpful to break the mens rea requirements down into smaller steps and reiterate that the jury instructions must inform the jury of the following three things: (1) the principal, Garth's brother, must have had the intent to kill the victim, Hardy; (2) Garth must have had the intent that Hardy would be killed, and (3) Garth must have knowingly or intentionally aided, induced, or caused his brother to commit the crime of attempted murder. Because jury instruction five describes the mens rea requirement for attempted murder and not for accomplice liability, that instruction allows a jury to infer that Garth could be convicted if his brother intended to kill Hardy even if Garth neither intended to kill Hardy nor intended that his brother would kill Hardy. The instruction does not advise a jury that the accomplice must have the same mens rea as the principal. And in fact, this confusion is amplified by instruction number twelve, which informs jurors that if an accomplice "combines and confederates with others to accomplish an illegal purpose, he is liable criminally for everything done by his confederates which flows incidentally from the execution of the common design as the natural and probable consequences of the common design." (R. at 20, p. 707). According to this instruction, if Garth's brother committed attempted murder, Garth is liable as well without regard to Garth's state of mind. This is plainly incorrect and compounds the error of instruction number eleven.

As the majority correctly points out, a court must consider the jury instructions as a whole when evaluating whether they adequately informed the jury of the state's burden. The PCA court's conclusion that the definition in instruction five cured the omission in instruction eleven ignores the misleading effect of instruction twelve that I just described. More importantly, it ignores the outright error of instruction number two which also grossly misstates the mens rea requirement for attempted murder. Recall that instruction number two states:

> The crime of attempted murder as charged in Count I is defined by statute as follows: A person who **knowingly or intentionally** kills another human being commits murder, a felony. A person attempts to commit a murder when, acting with the culpability required for commission of the murder**,** he engages in conduct that constitutes a substantial step toward commission of the murder.

(R. at 20, p. 696) (emphasis added). It is undisputed, however, that in order to prove attempted murder in Indiana, the government must prove that the defendant intended to kill, not merely that he did so knowingly. *Spradlin v. Indiana*, 569 N.E.2d 948, 950 (Ind. 1984). The instruction goes on to further confuse the distinction between intentionally and knowingly:

> To convict the defendant, Faraji Omar Garth, in Count I, the State must have proved each of the following elements:
>
> The defendant
>
> 1.   on or about August 21, 1997,
>
> 2.   acting with the specific intent to commit murder, to-wit: **knowingly** killing James Hardy,
>
> 3.   did intentionally point a loaded Raven .25 caliber

> handgun at the head of the said James Hardy and repeatedly pull the trigger,

4.  which conduct constituted a substantial step toward the commission of the intended crime of murder.

If the state failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant not guilty.

If the State did not prove each of these elements beyond a reasonable doubt, you should find the Defendant guilty of the crime of attempted murder, a Class A Felony, in Count I.

(R. at 20, p. 696-97) (emphasis added). Not only is this instruction erroneous, but it contradicts the clear instruction in instruction five that "attempt is a crime of specific intent, that is, it must be done with the intent to commit the alleged felony."[1]

---

[1] The PCA court's unreasonable application of *Strickland* was compounded by its inaccurate conclusion that Garth challenged only jury instruction number eleven. Because of this error, the PCA court failed to review the errors in the instructions on attempted murder. The PCA court's conclusion on this matter was wrong. Garth did not limit his objection to jury instruction number eleven which specifically defines accomplice liability in Indiana, but rather stated generally that the "jury instructions given at his trial failed to adequately advise the jury that, in order for it to find Faraji Garth guilty of attempted murder as an accomplice or accessory, the State must prove beyond a reasonable doubt that Garth had 'specific intent to kill' the alleged victim, James Hardy." *See* Post-conviction Relief Brief at 13 (R. at 27, Ex. G to Ex. A, p. 13). In order to be convicted of accomplice liability for attempted murder in Indiana, the state had to prove that both the principal and the accomplice had the intent to kill the victim. Consequently any error in describing the mens rea for attempted murder was an error in

(continued...)

Summing up the morass created by the jury instructions:

(1) The defendant, the PCA court, and the majority all agree that instruction number eleven failed to describe the requisite intent for accomplice liability for attempted murder.

(2) The first half of jury instruction number two incorrectly stated that an accomplice could be guilty for merely knowingly engaging in the requisite conduct.

(3) The second half of instruction number two incorrectly instructed jurors that acting knowingly is the same as acting with specific intent.

(4) The only instruction that accurately described the intent requirement is instruction number five, but it did so only for attempt; it said nothing about accomplice liability, and directly contradicted the instruction in number two that "specific intent" means "knowingly."

(5) Instruction number twelve implied that if Garth's brother committed attempted murder, Garth would be liable as well without regard to Garth's state of mind.

Despite these catastrophic errors (including directly contradictory instructions), Garth's counsel stood silent. This was not a trial strategy or within the realm of

---

[1] (...continued)

describing the mens rea for accomplice liability for attempted murder. In any case, jury instructions must be viewed as a whole, so even if Garth failed to highlight other instructions, glaring errors in those instructions could not be ignored. A reviewing court may not look only at the jury instructions that mitigate an error and ignore those that intensify it. The PCA court's conclusion that there was "no compound error here" was plainly incorrect. *See* (PCA Decision at 10) (R. at 27, Ex. J to Ex. A, p. 10).

reasonable assistance. The failure to object to these erroneous jury instructions constituted an objectively unreasonable performance. The PCA court's contrary conclusion was not only incorrect, it was unreasonable.

Counsel's error is of no consequence, however, if the ineffectiveness did not prejudice Garth. *Goodman*, 467 F.3d at 1027. Garth need not demonstrate that it is more likely than not that proper objections to the jury instructions would have resulted in his acquittal; he need only establish that there is a reasonable probability, a better than negligible likelihood. *Strickland*, 466 U.S. at 693-94; *Harding v. Sternes,* 380 F.3d 1034, 1045 (7th Cir. 2004). In considering the reasonable probability of differing results we must be cognizant of the confusing nature of attempt and of accomplice liability. The Wisconsin Supreme Court has specifically recognized "the inherent ambiguity in attempted murder prosecutions and the need to instruct juries precisely as to the correct level of culpability." *Williams*, 737 N.E.2d at 740. That court further noted that "both the level of ambiguity and the corresponding need for precise jury instructions significantly increase in a prosecution for aiding an attempted murder." *Id.* Liability for being an accomplice to attempted murder hangs on the precise mens rea of the accused, and a minor imprecision in the jury instructions can readily alter the outcome of a trial. Garth admitted that he knew that the robbery was a risky crime and all but conceded that he acted knowingly. (R. at 636-638, 647). Instructions that told the jury that either knowledge or intent would suffice for a conviction for attempted murder as an accomplice sealed Garth's fate. Garth's lawyer's failure to object to such instructions obviously prejudiced Garth.

The majority does not discuss the issue of prejudice caused by counsel's ineffective assistance under the second prong of *Strickland*, choosing instead (and incorrectly,

I maintain) to evaluate the merits of Garth's freestanding claim of jury instruction error. By turning to the merits of the freestanding claim, the majority is forced to consider a "harmlessness" analysis without benefit of briefing from the State, which had properly argued that the freestanding claim had been waived. The majority concludes from its harmlessness analysis "[a]ny error in instructing the jury as to the intent to convict Garth of attempted murder was harmless. The reason is that Garth's intent was never seriously disputed at trial. The dispute was centered on whether Ahman actually tried to kill Hardy." *Ante* at 19. But Garth's intent was most certainly disputed at trial, and therefore under either a harmless standard or under *Strickland's* prejudice prong, the majority errs in its conclusion. The majority concedes that "[t]he government's whole theory of the case was that, despite being easily recognizable and identifiable, Garth and two others robbed the store without masks because they **intended** to kill the only witness to the crime." *Id.* (emphasis added). Garth disagreed. Specifically, Garth argued that neither he nor anyone intended to kill the store clerk and that no one attempted to do so. This case presented a paradigm dispute over the issue of intent.

The competing theories on intent were highlighted throughout the trial. The government advanced its theory of intent from its opening statement to the close. In the opening statement the government set forth its theory of the case:

> It is our theory of the case, and what we will prove to you, is that he wanted Mr. Hardy to die, because what you will hear is that this defendant was a regular of the store, so was his brother, Ahman, so was Leo Johnson. From the State's evidence, you are going to hear that not one of them had a mask on their face or hid their identity in any way . . . Our theory will simply be, ladies and gentleman, they did not wear

a mask, this defendant did not wear a mask, because
they were going to kill James Hardy, so they didn't
need to wear a mask.

(R. at 20, p. 228-29). During closing arguments the govern-
ment again spoke of the jury's need to consider the mens
rea and erroneously advised that:

> We need to show that Faraji Garth, on or about August
> 21 of 1997, acted with specific intent to commit the
> murder, that is the knowing kill . . . or the killing of
> James Hardy, by intentionally pointing a loaded Raven
> .25 caliber handgun at the head of said James Hardy,
> and repeatedly pulling the trigger, and that step
> constitutes a substantial step toward the commission
> of the murder.

*Id.* at 661. The government then reiterated, that "[t]here
can be no question that where he pointed that gun he was
trying to kill him, and that's not disputed." *Id.* at 662.
During rebuttal, the state argued again that the fact that
the men, who were known to the clerk, robbed the store
without masks, "cries out, and tells you, compels you to the
conclusion that you knew from the beginning that they
were going to kill James Hardy." *Id.* at 692-93.

Garth, on the other hand, countered that he had no
intent that anyone would be killed in this simple robbery:

On direct examination, Garth presented the following
testimony:

> Q. Was it your intention, at any time, to harm the
> attendant at the store?
>
> A. No. I never touched that man.
>
> Q. Would you have taken part in that robbery if
> anyone else had voiced intention to you about
> murdering this attendant?
>
> A. No.

*Id.* at 651. After the presentation of the state's case, Garth's defense counsel moved for a directed verdict arguing that:

> I would argue that, you know, insufficient evidence that the Defendant committed the crime of armed . . . of attempted murder. That there's been a total lack of evidence that he had the intent . . . the requisite intent required by statute.

*Id.* at 612. And finally, during his closing argument, Garth's counsel went straight to the heart of the issue of intent:

> [t]hey'll instruct you about intent and knowingly. Heavy, heavy burdens that you've got there when you start to analyze those. What constitutes the actual intent of this, I don't know, but you know there was . . . I don't think there was any intent there ever, on the part of anybody, certainly not on the part of Faraji over here in that, except for the intent to maybe commit a robbery on it.

*Id.* at 680.

Clearly the majority's conclusion that "intent was never seriously disputed" is incorrect. The majority's conclusion that Garth's defense "centered on whether Ahman actually tried to kill Hardy" is not inconsistent with a defense of lack of intent. *Ante* at 19. Garth's defense that his brother never pointed the gun at the victim's head and never pulled the trigger is precisely a defense about intent—it is intent to the *nth* degree. Garth argued that no one took any steps toward the commission of murder because no one intended to harm the clerk.

The PCA court's conclusion that the jury instruction error could not have prejudiced Garth was plainly unreasonable. But for counsel's failure to object to the jury instruction, there is more than a reasonable probability

that Garth would not have been convicted as an accomplice to attempted murder, as the evidence of intent was weak at best. In fact, the lawyer for the state admitted that he could not prove beyond a reasonable doubt that Garth intended that the clerk would be killed:

> Jury, there's one fact out here that screams out in this case. **I can't prove it to you beyond a reasonable doubt**, but I want you to think about it. Why would somebody go into a store, in their neighborhood, and try to rob a clerk that they knew, with no mask on his face? . . . You're not going to get caught if you murder the guy. There's not going to be any witnesses then. That fact cries out, and tells you, compels you, to the conclusion that you knew from the beginning they were going to kill James Hardy.

(R. at 20, p. 692-93) (emphasis added).

During closing arguments the state offered no other proof of Garth's intent other than this theory which it conceded could not be proved beyond a reasonable doubt. Garth's guilt or innocence on this count hung entirely on his intent, yet Garth's attorney failed to raise one single objection to the multiple erroneous instructions on intent, even in the face of a concession from the state that it could not prove intent. Such a failure prejudiced Garth and no reasonable court could have found otherwise. For this reason I respectfully dissent.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*