In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1442

CHRISTOPHER M. STEVENS,

*Petitioner-Appellant,*

*v.*

DANIEL MCBRIDE,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 03-CV-005—**Allen Sharp**, *Judge.*

ARGUED FEBRUARY 7, 2006—DECIDED JUNE 18, 2007

Before RIPPLE, MANION, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Christopher Stevens, an emotionally disturbed young man who had been abused and raped as a child, was sentenced to death in Indiana state court for the molestation and brutal murder of 10-year-old Zachary Snider. At Stevens's trial, the only evidence presented by the defense concerning his mental state at the time of the killing was the testimony of a psychologist who believes that mental illness is a myth. After the Indiana courts rejected Stevens's direct appeal and post-conviction review petition, he brought this habeas corpus petition under 28 U.S.C. § 2254, claiming principally that his attorneys' investigation and presentation of expert psychological testimony at his trial amounted to

ineffective assistance of counsel and deprived him of his only opportunity to avoid conviction and a death sentence. We conclude that the defense attorneys provided ineffective assistance at the penalty phase of the trial and grant Stevens's petition insofar as it relates to his sentence.

# I

## A

The underlying facts of this case are recounted in detail in the Indiana Supreme Court's decision affirming Stevens's conviction and sentence. See *Stevens v. Indiana*, 691 N.E.2d 412 (Ind. 1997). Those facts are entitled to a presumption of correctness, see 28 U.S.C. § 2254(e)(1), and they are in any event uncontested at this point. We repeat here only what is relevant to Stevens's current claims.

In February 1993, Stevens, who was 20 years old at the time, was convicted in Indiana state court of child molestation. After serving several months of his sentence, he was released on probation in May 1993. On the night before his release, Stevens had a conversation with a fellow inmate, Tracy Eastin, in which Eastin predicted that Stevens would be back in jail for the same crime again within two months. Stevens allegedly replied, "No, I won't. Next time I'll kill him."

Upon his release, Stevens went to live with his father in Cloverdale, Indiana. He soon befriended Snider, a 10-year-old who lived in the same subdivision as Stevens's father. On July 15, 1993, Snider went to Stevens's home in the late afternoon, where Stevens proceeded to molest him. Afterwards, Snider threatened to tell his parents about the assault; at this point, Stevens claims that he became scared and "clicked." He attempted to kill Snider by smothering him with a pillow and then strangling him

with a cord. After those methods proved unsuccessful, Stevens eventually managed to kill Snider by suffocating him with a plastic bag. Stevens then placed Snider's body and Snider's bicycle into the back of his car, drove out into the countryside, and threw the body and bike over a bridge. Later, he returned to the site to retrieve a plastic bag that he feared, if found, might assist the police in identifying him as Snider's killer.

When Snider did not return home during the evening of July 15, his parents began to search the neighborhood. They came across Stevens in front of his house. Lying to them, Stevens denied having seen Snider all day. On July 17, the police picked up Stevens for questioning, confronting him with the fact that a witness had seen Snider's bicycle parked in front of his home on the day of the murder. Stevens admitted to police that Snider had visited him briefly, but he denied having anything to do with his disappearance. Two days later, Stevens confessed to his brother Mark Stevens that he had killed Snider, explaining in detail what had occurred and directing his brother to the bridge where the body was hidden. Mark Stevens went to the police, who later arrested Christopher Stevens.

**B**

After Stevens was charged with Snider's murder the State announced its intention to seek the death penalty. The Putnam County Superior Court appointed two lawyers for Stevens: Jeffrey Baldwin as lead defense counsel and Robert Clutter as second counsel. Soon thereafter, the case was transferred to the Tippecanoe County Superior Court. Baldwin retained Carol Knoy as a defense mitigation specialist. From conversations with Stevens, it quickly became apparent to the defense team that a mental health examination would be an important component of trial preparation. Stevens told his lawyers that he had been

physically, mentally, and emotionally abused as a child, and had been raped by a stranger when he was 10 years old. Medical records from a psychiatric facility where Stevens was briefly a patient reported that he had attempted suicide. Doctors there had diagnosed him with major depression and possible schizophrenia. Stevens also wrote a letter to Knoy in which he stated that when he killed Snider he "put himself in Zachary's place, and he was doing to Zachary what he wished the man who had raped him would have done to him."

Upon Knoy's recommendation, defense counsel retained as a mental health consultant clinical psychologist Dr. Lawrence Lennon, who at the time was director of a child and adolescent psychiatric center at an Indianapolis hospital. Upon meeting with Dr. Lennon for the first time, defense counsel instructed him to evaluate Stevens but not to write a report on his findings. Despite this explicit direction, Dr. Lennon wrote a report and sent it to Stevens's attorneys. The report included numerous statements that were extremely detrimental to Stevens's case. Because this report is so central to Stevens's claims, we reproduce excerpts of it here:

> Mr. Stevens revealed no evidence of any hallucinations or delusions. . . . There is no reason to believe that he has ever been out of touch with reality except perhaps when he has been under the influence of drugs. . . .
>
> He said he has molested approximately 25-30 children (mostly boys) and has shot and killed one boy out west (later he recanted this story). . . .
>
> He rarely accepts responsibility for his actions and tries to blame others for all the problems he has encountered. . . .
>
> The murder of Zachary appears to be directly related to his fear of having to return to prison after Zachary

revealed he would report Mr. Stevens' sexual assault. Mr. Stevens did not seem to reveal sincere sorrow for killing Zachary and is much more preoccupied with saving his own life.

Sexually, Mr. Stevens seems well versed in pedophilia and readily accepts this diagnosis. . . .

Mr. Stevens is in need of intensive counseling although due to his manipulative behavior he is not now a good candidate for psychotherapy. . . .

Mr. Stevens is, at this time, a serious danger to society and there is every reason to believe he would continue to molest children, especially boys, if given another opportunity. Given his present mental state, one could not rule out another violent assault on a young victim if Mr. Stevens again felt it was necessary.

Upon receipt of the report, Stevens's lawyers immediately contacted Dr. Lennon to question why he had disobeyed their instructions. Stevens's attorney Robert Clutter testified that Dr. Lennon, echoing Marlene Dietrich's portrayal of the character Christine Helm Vole in the 1957 film version of *Witness for the Prosecution*, responded: "Don't worry about it. I'm sandbagging the State. . . . I'm trying to make them think that I'm going to be a good witness for them, but I'm going to take—when I take the stand, I'm going to be able to turn this all around on them."

Around the same time, Stevens's lawyers also learned that Dr. Lennon subscribed to an unusual psychological theory known as the "myth of mental illness." Stevens's lawyers believed that Dr. Lennon's belief in this theory placed him in the one percent minority of psychologists who believe that mental diseases do not exist. They concluded that he was a "quack." Stevens's lawyers also

learned about Dr. Lennon's favored therapeutic technique, "trust and bonding therapy," which the lawyers (and later Dr. Lennon himself) described as "putting 18-year-olds on his lap and sticking a bottle in their mouth." Despite their serious and well-founded doubts about Dr. Lennon's fitness as a defense expert, Stevens's counsel did not seek an alternative. In addition, prior to trial the lawyers sent a copy of Dr. Lennon's report to the prosecution.

Neither Dr. Lennon nor any other mental health professional testified during the guilt phase at the trial. Instead, Stevens's counsel tried to convince the jury that Stevens was guilty of voluntary manslaughter rather than intentional homicide because he acted in a state of sudden heat provoked by Snider's threat to disclose Stevens's molestation of him. This strategy was unsuccessful, as the trial court refused to give a proposed jury instruction on voluntary manslaughter. The jury returned a guilty verdict.

At the penalty phase of the trial, defense counsel presented testimony from Stevens himself, as well as from numerous members of Stevens's family. As their final witness, Stevens's lawyers called Dr. Lennon. Dr. Lennon began his testimony by describing at length his preferred form of therapy for troubled children, stating that he typically would forcibly hold a young person down in his lap for "a fun time where the child tries to get away" until the child is exhausted and then, "we'll talk about the child, the little baby inside this boy that was never nourished, never loved . . . and in some cases we'll actually give a bottle. The mother will give a bottle to the 17-year-old and 16-year-old . . . ." Dr. Lennon also described his diagnostic technique of looking at photographs of troubled children at younger ages where "[w]e see . . . a beautiful child that it makes you wonder why, what happened . . . and then we look at where the person is today, and we try to figure out what's going on."

Eventually turning to the subject of Stevens, after more than twenty pages of testimony on his theories of child development and his "trust and bonding" therapy, Dr. Lennon testified about the "terrible childhood" and some of the abuse Stevens had experienced. Notably, Dr. Lennon did not provide any evaluation of Stevens's current mental health, except to say that Stevens "shows traits of . . . [a reactive] attachment disorder," which, according to Dr. Lennon, means that Stevens is "going to live . . . by using people." Dr. Lennon also stated that Stevens is "emotionally like a twelve-year-old" just after describing him as "a very pathetic kid." Dr. Lennon said nothing to connect Stevens's difficult childhood to his mental state at the time of the murder.

The prosecution's cross-examination of Dr. Lennon closely tracked Dr. Lennon's written evaluation of Stevens. Prosecutors asked Dr. Lennon to confirm his statement that the murder of Snider was directly related to Stevens's fear of having to return to prison. Dr. Lennon volunteered that Stevens had antisocial qualities and sociopathic traits. After walking Dr. Lennon through the report, the prosecutor asked Dr. Lennon whether Stevens had been sexually aroused by killing Snider and whether he had masturbated on Snider's body. Dr. Lennon responded that Stevens had admitted that he had done so. Dr. Lennon had never disclosed this devastating fact to defense counsel.

The jury unanimously recommended a death sentence. After Stevens's attorneys called Dr. Lennon to testify a second time at the sentencing hearing, during which Dr. Lennon described Stevens as presenting "a great risk to society," the trial court accepted the jury's recommendation of death. In so doing, the court stated for the record that it found that the mitigation evidence presented by Stevens was "far outweighed" by the aggravation factors provided by the State. In summary the court stated:

[T]he Court finds this murder was calculated. It was motivated by self-preservation, coolly performed with deliberation, and coupled with the defendant's sexual gratification. The defendant placed the possibility of his arrest for child molesting above the life of a ten year old boy. He stated that if placed in this position he would kill in order to avoid returning to jail. That is exactly what he did. He clearly acted in a cold-blooded manner.

The Indiana Supreme Court affirmed Stevens's conviction and sentence on direct appeal. After obtaining new counsel, Stevens filed a state petition for post-conviction relief. After holding an evidentiary hearing, the trial court denied this petition; the Indiana Supreme Court later affirmed this denial. Finally, Stevens filed this petition for habeas corpus in district court. The district court denied Stevens's claims, leading to this appeal.

## II

Our review of Stevens's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, which permits a federal court to issue a writ of habeas corpus only if the state court reached a decision on the merits of a claim, and that decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Since Stevens's principal argument involves a claim of ineffective assistance of counsel, it is governed by the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984), under which a defendant must show both that his lawyers' performance was deficient and that this deficient performance prejudiced his defense.

Although there is significant overlap between Stevens's claims that he received ineffective assistance of counsel relating to the investigation and presentation of expert psychological evidence at the guilt phase of the trial and at the penalty phase, for clarity we consider each argument in turn. We then briefly address two additional arguments that Stevens raises in his petition.

## A. Guilt Phase

Throughout his state and federal post-conviction proceedings, Stevens has claimed that his lawyers were ineffective for not adequately investigating his mental state and, as a result, failing to pursue an insanity defense during the guilt phase of the trial and instead relying on a doomed voluntary manslaughter theory. In its decision denying post-conviction relief, the Indiana Supreme Court rejected this argument, concluding that defense counsels' decision not to pursue such a defense was a strategic one based on adequate investigation. In any case, the court held, Stevens was not prejudiced by his lawyers' performance because Stevens's actions during and after the killing constituted such strong evidence that Stevens was aware of the wrongfulness of his conduct that no reasonable jury could conclude otherwise.

Our review of Stevens's counsels' performance is "highly deferential"; Stevens is required to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation marks omitted). The choice not to investigate a particular defense does not constitute deficient performance "if a lawyer has made a reasonable decision that makes particular investigations unnecessary." *Adams v. Bertrand*, 453 F.3d 428, 436 (7th Cir. 2006) (quotation marks omitted).

In an attempt to overcome the presumption of sound trial strategy, Stevens relies on his lawyers' frank admissions at the state post-conviction hearing that they were aware from the beginning of their representation of Stevens that a comprehensive mental health evaluation would be a crucial prerequisite for determining trial strategy, yet after Dr. Lennon failed to provide them with such an evaluation they neglected to consult an alternative mental health expert. Stevens also emphasizes that his lawyers did not offer any rationale for their decision not to seek an additional expert. To the contrary, they explicitly disclaimed any strategic basis for their actions.

In contrast, the State, echoing the Indiana Supreme Court, contends that defense counsels' investigation of Stevens's mental state was adequate because it was reasonable for them to rely on Dr. Lennon, whom the State describes as a well-qualified and experienced mental health professional. The State further argues that it was a reasonable strategic choice for counsel to choose a voluntary manslaughter defense over a mental illness defense, since, it claims, choosing the latter path "would have opened the door to the admission of incriminating evidence not otherwise presented at the guilt phase," namely, Eastin's testimony regarding Stevens's jailhouse statement.

The general qualifications of an expert witness do not guarantee that the witness will provide proficient assistance in any given instance. For example, even the most brilliant of witnesses might fail to address the important question at issue or might simply reiterate propositions so well-known that they are proper subjects for judicial notice. Experience in the federal courts illustrates this point. In an antitrust case, for example, this court upheld a district court's exclusion of the expert testimony of a Nobel Prize-winning economist on the ground that, despite his impeccable qualifications, his testimony

"mainly concerned a matter not in issue" (probably because counsel never asked him the right questions). *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 786 (7th Cir. 1999). There, the relevant rule was Federal Rule of Evidence 702, which requires not only that an expert witness be "qualified as an expert by knowledge, skill, experience, training, or education," but also that the expert's testimony be "the product of reliable principles and methods."

Indiana, naturally, is under no obligation to follow federal procedural rules, including the rules of evidence. At the time of Stevens's trial, however, Indiana had a rule very much like the present FED. R. EVID. 702, or like IND. R. EVID. 702 (effective Jan. 1, 1994): "[G]iven a subject matter appropriate for expert testimony, the opinion must be preceded by a foundation of evidence establishing the witness's credentials as an expert and the reliability of any scientific methods utilized by the witness to reach the opinion." See *Noblesville Casting Div. of TRW, Inc. v. Prince*, 438 N.E.2d 722, 727 (Ind. 1982); see also *Martin v. Roberts*, 464 N.E.2d 896, 899 (Ind. 1984) (holding that a potential expert witness "had to show to the trial judge his knowledge and experience in the field to qualify as an expert"). The problem here related first to the methods that Dr. Lennon used and his idiosyncratic view of mental disorders, and even more importantly, to the fact that Dr. Lennon's views favored the prosecution. Stevens's lawyers were aware that Dr. Lennon was part of a tiny minority of mental health professionals. (It is odd, given his views, that Dr. Lennon had worked at a psychiatric hospital. As the website of the American Psychiatry Association illustrates, psychiatrists devote their lives to the study and treatment of mental disorders. See http://www.psych.org/about_apa/. They, and the psychologists who frequently work with them, would undoubtedly take issue with the idea that they are tackling a "myth.")

In light of the stakes in the case and the evidence the defense had to confront, it would not have been reasonable for defense counsel to rely on Dr. Lennon's evaluation of Stevens based only on his credentials.

Putting that question to one side for now, we are also troubled by the State's effort to characterize the defense lawyers' reliance on a voluntary manslaughter defense as a reasonable strategic choice. As the Indiana Supreme Court recognized in roundly rejecting Stevens's argument on direct appeal that the trial court should have given the voluntary manslaughter instruction, "[n]othing in these facts" indicates that Stevens acted in "sudden heat" as defined by Indiana law, since "words alone cannot constitute sufficient provocation to give rise to a finding of sudden heat warranting an instruction on voluntary manslaughter." *Stevens*, 691 N.E.2d at 426-27 (quoting *Matheny v. Indiana*, 583 N.E.2d 1202, 1205 (Ind. 1992)). Nor is the State's assertion that a mental illness defense would have opened the door to Eastin's testimony particularly telling. As Stevens correctly points out, the same door would have been opened if counsel had managed to obtain a voluntary manslaughter instruction, since both defenses involve the element of intent.

In light of Stevens's lawyers' admissions and the overall weakness of the defense they presented at trial, we are inclined to believe that their performance was ineffective. Before attempting to resolve that issue definitively, however, we look at the prejudice branch of the *Strickland* test. We do so because the Supreme Court has explicitly noted that *both* deficient performance and prejudice must be shown in order to prove constitutionally ineffective assistance of counsel. If either element is missing, the petitioner cannot prevail. See *Strickland*, 466 U.S. at 697. We therefore turn to the question whether Stevens was prejudiced by his counsels' performance at the guilt phase of his trial.

In Indiana,"[a] person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense." Ind. Code § 35-41-3-6. This is a difficult standard to meet; the defendant carries the burden of proof and the Indiana Supreme Court has made clear that it will reverse a trial court's denial of an insanity claim "only when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed." *Thompson v. Indiana*, 804 N.E.2d 1146, 1149 (Ind. 2004).

To show that an insanity defense was possible, Stevens relies heavily on several mental health experts who testified at the post-conviction hearing that Stevens was severely mentally ill and that his mental illness played a determining role in the murder. After conducting a comprehensive psychological evaluation of Stevens, Dr. Philip Coons, Professor of Psychology at the Indiana School of Medicine, diagnosed him as having a "very severe dissociative disorder," opining that "at the time of the murder, he was not only dissociating, but the identity between he and [Snider] got mixed up. . . . [H]e's basically killing Zach because it's what he would have wanted in that molestation at age 10, to have been killed by his abuser." While Dr. Coons acknowledged that Stevens "obviously knew right from wrong" after the killing, "because he engaged in all kinds of behaviors to cover up what he had done," Coons emphasized that Stevens's ability to appreciate the wrongfulness of his conduct at the time of the murder was "impaired." Dr. Robert Kaplan, a clinical psychologist, agreed that it was "very clear" that Stevens suffers from "a dissociative disorder," explaining that a family history of physical and sexual abuse corroborated such a diagnosis, as did a review of Stevens's behavior during his videotaped confession. Dr. Kaplan described Stevens's childhood as "a recipe for

developing someone with a dissociative disorder." Dr. Kaplan, like Dr. Coons, testified that it was his opinion that "[t]he part of [Stevens] that's able to appreciate the wrongfulness of his conduct was disengaged when he was dissociating," adding that it was clear that Stevens was under extreme emotional distress and "was actively dissociating at the time that the murder was occurring."

To prove prejudice it is not enough for Stevens simply to show that a mental illness line of defense was available. *Strickland* requires him to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* And, of course, we conduct this analysis through the lens of AEDPA's unreasonableness standard, a standard that "allows the state court's conclusion to stand if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997).

Considering the evidence in the record of Stevens's extended efforts to kill Snider and later to cover up the murder, the Indiana Supreme Court's conclusion that no jury could conclude that Stevens did not appreciate the wrongfulness of his conduct at the time of the murder was not implausible. Although we think that there is a possibility that a jury presented with the expert testimony of Dr. Coons and Dr. Kaplan might have concluded that Stevens was legally insane at the time of the killing based on a dissociation theory, this possibility does not render the Indiana Supreme Court's contrary conclusion unreasonable. See *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (AEDPA's unreasonableness standard "means something like lying well outside the boundaries of permissible differences of opinion"). We therefore conclude that the Indiana Supreme Court did not unreasonably apply *Strickland* in determining that Stevens was

not prejudiced by his counsels' failure adequately to investigate and pursue an insanity defense during the guilt phase of his trial.

One final comment on Stevens's guilt phase claim: in his reply brief, Stevens argues that, in addition to an insanity plea, his trial lawyers should have pursued a defense of guilty but mentally ill (GBMI). See Ind. Code § 35-36-2-5. Such a defense is available in cases in which a defendant "was mentally ill but able to distinguish right from wrong at the time of the offense." *Weeks v. Indiana*, 697 N.E.2d 28, 29 (Ind. 1998). Although a jury finding of GBMI "does not guarantee a defendant that the death penalty will not be imposed . . . as a practical matter, defendants found to be guilty but mentally ill of death-penalty-eligible murders normally receive a term of years or life imprisonment." *Prowell v. Indiana*, 741 N.E.2d 704, 717 (Ind. 2001) (internal citation omitted). For this reason, the Indiana Supreme Court has held that a defendant claiming ineffective assistance of counsel may prove prejudice by showing that but for his counsel's deficient performance "a trial would have produced a result of . . . guilty but mentally ill." *Id.* at 717.

Merits aside, we find it inappropriate to consider this argument because Stevens never argued to the Indiana courts that this was one way in which he intended to prove his ineffective assistance of counsel claim. Section 2254(b)(1)(A)'s exhaustion provision "requires the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). Adequate presentation of a claim requires a petitioner to "present both the operative facts and the legal principles that control each claim to the state judiciary." *Rittenhouse v. Battles*, 263 F.3d 689, 695 (7th Cir. 2001). Here, although Stevens presented his ineffectiveness claim to the state

courts, he never presented as a supporting argument the lawyers' failure to raise the GBMI defense at trial. (It may be worth noting here that although we assess counsel's performance as a whole for purposes of granting certificates of appealability under 28 U.S.C. § 2253(c)(2), and thus a certificate identifying ineffective assistance of counsel brings up all of counsel's actions, see *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005) ("[I]t is the overall deficient performance [by a defendant's attorney], rather than a specific failing, that constitutes the ground of relief."), the purposes behind the rules of procedural default requires a party to present to the state court both the facts and the law on which he relies. Thus, the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default.) Instead, throughout the post-conviction proceedings, Stevens couched his mental illness defense theory either in general terms (contending in his petition for post-conviction relief that his counsels' "unreasonabl[e] fail[ure] to investigate, develop, prepare, and present available evidence, including but not limited to evidence of diagnosable mental and emotional disabilities, [ ] would have given rise to a defense to the charge") or in terms specific to an insanity defense (arguing in his proposed conclusions of law that Dr. Coons's testimony, for example, supported a finding that Stevens was unable to "appreciate the wrongfulness of his conduct at the time of the killing"). Neither argument sufficiently alerted the state court to the fact that Stevens intended to prove ineffectiveness through counsel's failure to present the GBMI claim, and therefore Stevens may not do so here.

## B. Sentencing Phase

In seeking relief from his capital sentence, Stevens repeats many of the same arguments regarding the

inadequacy of defense counsels' handling of expert psychological testimony that he made for the guilt phase. For sentencing purposes, he stresses counsels' failure to develop mitigation evidence related to his mental state and their ill-fated decision to call Dr. Lennon not once, but twice, as a defense witness. The Indiana Supreme Court rejected the first aspect of this claim for the same reason it rejected Stevens's guilt phase ineffectiveness claim: it concluded that defense counsel had adequately investigated Stevens's mental health through Dr. Lennon and then made a strategic decision not to present mitigation evidence related to Stevens's mental state. The court did not, however, have anything to say about Stevens's lawyers' decision to call Dr. Lennon as a defense witness for sentencing purposes, other than to acknowledge Stevens's argument that Dr. Lennon "was a fatal [*sic*] witness for the defense."

The Indiana death penalty statute requires the State to prove beyond a reasonable doubt the existence of at least one enumerated aggravating circumstance. Ind. Code § 35-50-2-9(b)(1). In Stevens's case, the State focused on three aggravating circumstances: that Stevens committed the murder while committing the crime of child molestation, that Stevens was on probation at the time of the murder, and that the victim was under the age of 12. The statute allows a defendant to provide evidence about both the aggravating circumstances alleged by the prosecution and enumerated mitigating circumstances. Here, at least two such mitigating circumstances were implicated: first, that "[t]he defendant was under the influence of extreme mental or emotional disturbance when the murder was committed," and second, that "[t]he defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect." Ind. Code § 35-50-2-9(c)(2) & (6). The only other

mitigating circumstance that could have applied to Stevens under Indiana law was the catch-all "[a]ny other circumstances appropriate for consideration." Ind. Code § 35-50-2-9(c)(8).

The Supreme Court has made clear that in evaluating claims of ineffective counsel, "we must take [the] purpose [of assistance of counsel]—to ensure a fair trial—as the guide." *Strickland*, 466 U.S. at 686. *Strickland* held that counsel's performance during the capital sentencing phase of a criminal case is subject to the same standards as counsel's performance during the trial itself. *Id.* at 686-87. In other words, the petitioner must demonstrate that counsel was ineffective and that the petitioner was prejudiced by counsel's performance. *Id.* at 687. Counsel's most "basic duties" include the "duty to advocate the defendant's cause," the "duty to bring to bear such skill and knowledge as will render the trial [or capital sentencing phase] a reliable adversarial testing process," and the "duty to investigate," which was at issue in *Strickland*. *Id.* at 688, 691.

In assessing whether counsel was ineffective, the *Strickland* Court requires the "defendant making a claim of ineffective assistance [to] identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Following such a showing, "[t]he court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Although counsel's strategic choices are given considerable deference, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

*Strickland* particularly referred to "[p]revailing norms of practice as reflected in American Bar Association standards" as "guides to determining what is reasonable," but it emphasized that a court's ultimate determination of counsel's effectiveness must be grounded in the specific circumstances of the case. *Id.* at 688. The ABA Guidelines state that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989).[1]

Although Stevens's trial counsel presented testimony from a number of witnesses, principally family members, during the penalty phase of the trial, very little of this testimony addressed any statutory mitigating factor other than perhaps the catch-all "other circumstances" factor. None of it addressed whether Stevens was suffering from an extreme emotional disturbance or was unable to appreciate the wrongfulness of his conduct at the time of the murder, both theories that Dr. Coons's and Dr. Kaplan's later diagnoses of Stevens suggest would have been supported, had counsel only pursued them. See Ind. Code § 35-50-2-9(c)(2) & (6). Stevens contends that this failure to investigate and present mitigation evidence

---

[1] Later, the Supreme Court cited this standard specifically and approvingly in its decision in *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). The *Wiggins* case, however, was decided six years after the Indiana Supreme Court considered Stevens's ineffective assistance of counsel claims, and therefore for purposes of this case cannot serve as a source of "clearly established Federal law, as determined by the Supreme Court." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006). Nevertheless, *Wiggins* sheds some light on what the Court itself understood as the scope of its *Strickland* holding.

on his mental state constituted deficient performance. The State responds that defense counsels' choice not to look for other mental health professionals and instead to rely on Dr. Lennon's testimony was a reasonable strategic decision on the part of counsel and "a straightforward approach to mitigation, as it explained reasons for Stevens's conduct that portrayed Stevens himself as a victim."

The strategic reasons that might, at a stretch, have justified this decision at the guilt phase, fall apart when we consider that at the sentencing phase Stevens had nothing left to lose. The lawyers' decision to forego presenting this kind of mitigation evidence was made without the kind of investigation into Stevens's mental health that *Strickland* calls for, *after* Stevens's lawyers had concluded that Dr. Lennon was a "quack." Indeed, it is uncontested that Stevens's lawyers knew nothing about the content of Dr. Lennon's planned testimony. The lawyers confessed at the post-conviction hearing that they were utterly in the dark about what Dr. Lennon would say when he took the stand. They frankly admitted that during trial preparations, Dr. Lennon would only repeat, "I can handle it. Don't worry about it." This is a complete failure of the duty to investigate with no professional justification. Where an expert witness's opinion is "crucial to the defense theory[,] defense counsel's failure to have questioned [the expert] . . . prior to trial is inexcusable." *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000).

Furthermore, given the fact that defense counsel did know what Dr. Lennon had written in his report, we cannot imagine what they hoped to gain by calling Dr. Lennon to the stand at sentencing. This decision was the catalyst for their action in turning over Dr. Lennon's extremely detrimental written report to prosecutors prior to trial. The Indiana Supreme Court indicated that this fact did not constitute an indication of deficient perfor-

mance since the trial court had required "any reports from experts" to be turned over to the State prior to trial. *Stevens v. Indiana*, 770 N.E.2d 739, 748 n.4 (Ind. 2002). Our review of the record reveals, however, that the trial court's order pertained only to reports from expert trial *witnesses* retained by the defense. Stevens's lawyers could have designated Dr. Lennon as a trial consultant rather than an expert witness, thereby shielding his written report from the prosecution. See Indiana Trial Rule 26(B)(4)(b) ("A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only . . . upon a showing of exceptional circumstances. . . ."); *cf. Beauchamp v. Indiana*, 788 N.E.2d 881, 892 (Ind. Ct. App. 2003) (applying Rule 26(B)(4)(b) and stating that "a party should certainly be protected when obtaining expert advice he requires in order to properly evaluate and present his case without fear that every consultation will be discoverable").

A straightforward application of the first *Strickland* requirement compels a conclusion that these "acts and omissions" of Stevens's counsel during the capital sentencing phase constitute errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 690. We conclude, on this record, that the performance of Stevens's lawyers at his capital sentencing proceedings fell below the constitutional minimum.

We thus turn to the prejudice inquiry. The *Strickland* Court held that in order to show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As it did for the guilt phase of the trial, the Indiana Supreme Court reasoned that Stevens was not disadvantaged by his counsels' failure to develop mitigation evidence regarding his psychological state because such evidence "would have been strongly contradicted by the extensive evidence of the defendant's multiple attempts to kill Zachary and then carefully to take steps to cover-up the crime." *Stevens*, 770 N.E.2d at 754. But there is an important difference between the statutory mitigating factors of § 35-50-2-9(c)(2) & (6) for capital sentencing purposes and the requirements for proving an insanity defense at the guilt phase. Furthermore, the burden on the defendant is not as heavy at sentencing as during the guilt phase. See *Baird v. Davis*, 388 F.3d 1110, 1122 (7th Cir. 2004) ("Substantial impairment of one's capacity to conform conduct to the requirements of law as a result of mental disease or defect is qualitatively different from the mere status of being 'under the influence' of extreme mental or emotional disturbance."); *St. Pierre v. Walls*, 297 F.3d 617, 632 (7th Cir. 2002) ("While a defendant's mental state at the time of the crime might not rise to the level of a defense to the crime, it can be relevant in a mitigation hearing."). As a legal matter, a mental illness mitigation defense to the imposition of a death sentence may be available even if an insanity defense to the murder charge is not.

In this case, we find a reasonable probability—that is, one sufficient to undermine our confidence in the outcome of the sentencing phase—that the result would have been different if the jury had heard mainstream expert psychological testimony of the sort presented by Dr. Coons and Dr. Kaplan at the post-conviction hearing. See *Strickland*, 466 U.S. at 694. Competent evidence of Stevens's mental illness would have strengthened the general mitigation evidence presented by defense counsel concerning Stevens's difficult background by focusing the jury on

the concrete results of years of abuse on Stevens's psyche. There was, in addition, little downside risk of presenting such evidence to the jury; evidence of the most damning sort was already before the jury. Cumulative evidence of his predatory pedophilia and his specific actions on the fateful day was not likely to make any difference. And unlike general mitigation evidence concerning Stevens's background, evidence about Stevens's severely dissociated condition and impaired ability to appreciate the wrongfulness of his conduct at the time of the killing would have provided his lawyers a basis for rebutting the aggravating factors highlighted by the State.

On this record, defense counsels' decision to call Dr. Lennon to testify before the jury at the penalty phase—not to mention their decision to call him a *second* time to testify before the trial judge at sentencing—can only be viewed as prejudicial to the outcome of the sentencing proceeding. Not only did Dr. Lennon stun defense counsel by revealing to the jury that Stevens had engaged in necrophilia after the murder, he also gave the prosecution a gift by expressing his belief in Stevens's future dangerousness—a subject that the prosecution itself is not permitted to argue as an aggravating circumstance under Indiana law. See *Wisehart v. Indiana*, 693 N.E.2d 23, 60 (Ind. 1998). Not only did Dr. Lennon's testimony almost certainly influence the jury against Stevens, it also evidently had a strong impact on the trial judge. One cannot read the court's sentencing order, with its references to "cool deliberation," "self-preservation," and "sexual gratification," without seeing a close reflection of Dr. Lennon's written report and testimony.

We conclude that the conduct of Stevens's lawyers at his capital sentencing proceedings fell below the constitutional minimum standard and that this was prejudicial to Stevens. The Indiana Supreme Court's ruling to the contrary amounted to an unreasonable application of *Strickland*.

## C. Other Claims

In addition to his arguments about his counsels' handling of the expert psychological evidence, Stevens raises two other complaints about his lawyers' assistance on which we comment briefly: that they were ineffective for failing to object to the requirement that he wear a stun belt throughout the trial and that the district court improperly denied him discovery to pursue an argument that prosecutors presented perjured testimony to the jury.

With regard to the stun belt, Stevens claims that a criminal defendant has a clearly established constitutional right to be free of restraints at trial and that he was prejudiced because his fear of being electrocuted made him appear withdrawn and unremorseful to the jury. The Indiana Supreme Court found no merit in this claim. While acknowledging that since the time of Stevens's trial it had decided that criminal defendants may not be required to wear stun belts in Indiana courtrooms, see *Wrinkles v. Indiana*, 749 N.E.2d 1179 (Ind. 2001), the court concluded that Stevens was not prejudiced by being forced to wear the device because the jurors were not aware that he had it on and because juror testimony at the post-conviction hearing did not indicate that the device had a significant effect on Stevens's demeanor.

The Indiana Supreme Court's analysis of this claim is not unreasonable. Although the six jurors who testified at the post-conviction hearing stated that Stevens appeared emotionally withdrawn at trial, Stevens also appeared withdrawn in the videotaped confession in which he was not wearing any restraint. It is thus impossible to know whether Stevens's demeanor at trial was a result of being forced to wear the stun belt or just reflective of his more general state of mind and the emotions he was experiencing in the courtroom.

In an attempt to salvage this claim, Stevens contends that the use of a stun belt during a criminal trial is inherently prejudicial. The cases cited by Stevens do not, however, go so far. They hold instead that a defendant's general right to be free of restraints in the courtroom is not absolute, but rather it is based on a balancing of the defendant's right not to be viewed in a prejudicial light by the jury against the court's need for security. See *Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that although "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding," this constitutional requirement "is not absolute" and so a judge may take account of "special circumstances . . . that may call for shackling"); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986) ("holding that the conspicuous . . . deployment of security personnel in a courtroom during trial" must be evaluated on a "case-by-case" basis); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (declining to hold that the binding and gagging of a criminal defendant is unconstitutional "under any possible circumstances"). In keeping with this line of cases, we have described the use of a stun belt as a "method[ ] of restraint that minimize[s] the risk of prejudice" because it is hidden beneath a defendant's clothing. *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir. 1997).

Stevens's final argument is that the district court erred by refusing to permit him to conduct discovery into an alleged pre-trial deal between prosecutors and state witness Tracy Eastin, in which prosecutors were going to give Eastin a letter requesting leniency in exchange for his testimony against Stevens. Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts states that "[a] party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good

cause shown grants leave to do so, but not otherwise." The district court concluded that discovery was not warranted in this case because the letters Stevens presented as evidence of the alleged deal showed only that prosecutors had attempted to assist Eastin "to obtain a safe housing assignment within the prison system so that he could be free from a possible assault from fellow inmates who were upset with his having testified against the petitioner."

Stevens argues only that the district court read the correspondence between prosecutors and Eastin too narrowly, and it should have inferred that a broader pre-existing deal had been reached. Suffice it to say that we are not persuaded. The district court's interpretation of the letters, while perhaps not the only possible way to look at them, was reasonable, and its denial of discovery on this basis was well within its discretion.

## III

For the foregoing reasons, the judgment of the district court is AFFIRMED to the extent that it denies habeas corpus relief with respect to Stevens's conviction, and it is otherwise VACATED. The case is REMANDED with instructions to issue a conditional writ of habeas corpus that sets aside the sentence of capital punishment unless, within 120 days, the State affords Stevens another penalty hearing.

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. I agree with the principal opinion in holding that Mr. Stevens' trial counsel was constitutionally ineffective during the penalty phase of the trial, and, therefore, that Mr. Stevens is entitled to a new sentencing proceeding. I write separately because I believe that counsel's shortcomings not only affected Mr. Stevens' sentence, but also his conviction. Therefore, I would grant habeas relief with respect to his conviction as well as his sentence.

## 1.

As the principal opinion explains, counsel for Mr. Stevens were aware "that a comprehensive mental health evaluation would be a crucial prerequisite for determining trial strategy, yet after Dr. Lennon failed to provide them with such an evaluation they neglected to consult an alternative health expert." Slip op. at 10. Counsel did not offer any strategic basis for not seeking out additional expert advice, and the State's proffered explanation for the reasonableness of counsel's choices does not suffice to justify their actions. *See id.* The principal opinion, therefore, concludes, correctly, that "[i]n light of Stevens's lawyers' admissions and the overall weakness of the defense they presented at trial, we are inclined to believe that their performance was ineffective." Slip op. at 12.[1]

---

[1] As the principal opinion notes, counsel's sole reliance on a voluntary manslaughter defense is troubling for several reasons. *See* slip op. at 12. First, the facts as presented to the trial court did not justify a voluntary manslaughter instruction. Second, securing a voluntary manslaughter instruction, like pursuing a mental illness defense, would have opened the door to Eastin's testimony. *See id.* Finally, nothing precluded counsel from
(continued...)

The principal opinion turns then to *Strickland*'s prejudice prong to determine whether Mr. Stevens' conviction may have been affected by counsel's failure.

After reviewing the standards for mental illness under Indiana law and also the standard for demonstrating prejudice under *Strickland*, the principal opinion concludes that "the Indiana Supreme Court's conclusion that no jury could conclude that Stevens did not appreciate the wrongfulness of his conduct at the time of the murder was not implausible." *Id.* at 14. In other words, the Supreme Court of Indiana's conclusion—that Mr. Stevens had not suffered any prejudice as a result of his counsel's missteps—was not unreasonable.

**2.**

In reaching this conclusion, I believe that the principal opinion reads the decision of the Supreme Court of Indiana too broadly. With respect to the question of whether trial counsel's investigation of the expert was adequate, the Supreme Court of Indiana concluded: "The trial court determined that defense counsel adequately investigated issues of substance abuse and mental illness and reasonably chose to pursue a different strategy. The post conviction court did not err in denying relief on this claim." *Stevens v. State*, 770 N.E.2d 739, 749 (Ind. 2002) (footnote omitted). This language speaks in terms of attorney performance—the focus of *Strickland*'s first prong—rather

---

[1] (...continued)
pursuing a voluntary manslaughter defense and at the same time presenting evidence of mental illness. Both focus on the defendant's ability to form the requisite criminal intent to commit murder, and the record does not suggest any justification for only pursuing the former course.

than to prejudice—the focus of *Strickland*'s second prong. Later in its opinion, the Supreme Court of Indiana also addresses counsel's decision to present a voluntary manslaughter theory as opposed to presenting a mental disease defense. After reviewing counsel's actions, the state supreme court again uses language that speaks to the performance inquiry of the first prong of *Strickland*: "The post-conviction court found that counsel's decision to pursue the voluntary manslaughter strategy, while ultimately unsuccessful, did not amount to deficient performance." *Id.* at 753. And, again, the Supreme Court of Indiana upheld that decision: "We conclude that the evidence as a whole does not lead unerringly and unmistakably to a decision opposite that reached by the post-conviction court, and we find that defense counsel's choice of defense theory did not constitute ineffective assistance of counsel." *Id.* In sum, the Supreme Court of Indiana rested its rejection of the merits of Mr. Stevens' ineffective assistance of counsel claim on *Strickland*'s performance prong; it did not address directly the question of prejudice.

**3.**

AEDPA instructs that, in the usual case, we apply a deferential standard to a state-court determination that is challenged by way of a habeas petition. *See Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005) ("Ordinarily, § 2254(d) requires that we determine whether the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"). "This standard only applies, however, to a claim that was adjudicated on the merits in State court proceedings." *Id.*

(internal quotation marks and citations omitted). "As a practical matter, a federal court cannot apply the deferential standard provided by § 2254(d) in the absence of any state court decision on the issue." *Id.* This principle is equally applicable to the separate inquiries under each prong of *Strickland*. In the words of the Supreme Court, "our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Thus, because the Supreme Court of Indiana did not reach the question of prejudice, we need not apply AEDPA deference;[2] we look to see only whether there is a reason-

---

[2] In addition to considering the decision of the Supreme Court of Indiana, Judge Manion suggests that, in assessing the question of prejudice, we should look at rationale relied upon by the state trial court as well, specifically the state trial court's "finding that the additional psychological evidence altered the nature of the sexual encounters between Stevens and Zachary." Concurring op. at 41-42. Judge Manion acknowledges that "[t]he Supreme Court of Indiana did not specifically mention the different description of the sexual encounter, but never rejected the trial court's findings and twice stated that additional evidence 'would have opened the door to the admission of substantial incriminating evidence not otherwise presented during the guilt phase.'" *Id.* at 42 (quoting *Stevens v. State*, 770 N.E.2d 739, 753 (Ind. 2002)).

For purposes of our review under AEDPA, the operative state-court decision "is that of the last state court to address the claim on the merits." *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006). In this case, the Supreme Court of Indiana, although specifically mentioning other evidence that could have been introduced had Mr. Stevens mounted a mental illness defense (namely Eastin's testimony), did not mention the alternative description of Mr. Stevens' last sexual encounter with Zachary. This omission may have been inadvertent, or the evidence may

(continued...)

able probability that, but for counsel's errors, the result of the trial would have been different.

### 4.

In this case, the evidence presented at Mr. Stevens' post-conviction hearing established that Dr. Lennon's ideas concerning mental illness were "completely abandoned" by the American Psychiatric Association in the 1980s and that "anyone who subscribes to the 'myth of mental illness'

---

[2]  (...continued)

have been encompassed by the reference to "substantial incriminating evidence." However, it also may be the case that the Supreme Court of Indiana did not agree with the trial court's conclusion that the additional facts fundamentally altered the jury's view of the "relationship" between Mr. Stevens and Zachary. One of the rationales for modern statutory rape laws is that sexual relations with a minor, especially one as young as Zachary, are "inherently nonconsensual." *See, e.g.*, Daryl J. Olszewski, Comment, *Statutory Rape in Wisconsin: History, Rationale & the Need for Reform*, 89 Marq. L. Rev. 693, 699 (2006). The Supreme Court of Indiana may have concluded that, even absent this evidence that the last encounter was forcible, not consensual, the jury already would have considered Mr. Stevens to be a sexual predator. In short, the jury's view would not have changed with the introduction of this additional evidence.

Thus, even assuming that the Supreme Court of Indiana's commentary on "open[ing] the door to the admission of substantial incriminating evidence," *Stevens*, 770 N.E.2d at 753, is meant to address *Strickland*'s second prong, it is not at all clear that the Supreme Court of Indiana meant to encompass within this statement reference to the state trial court's findings concerning the nature of the relationship between Zachary and Mr. Stevens. Consequently, these findings should not factor into this court's AEDPA analysis.

is not really in the mainstream of current thought among professionals." Post Conviction Record ("PCR") at 2015 (testimony of Dr. Kaplan). Mr. Stevens' counsel "had concluded that Dr. Lennon was [a] 'quack,'" but did not engage in further, critical investigation of Dr. Lennon's testimony or his theories that would have led them to seek the assistance of another expert. Slip op. at 20.

Had Mr. Stevens' counsel sufficiently investigated Dr. Lennon's testimony, and, as a result, secured additional expert evaluation, the jury would have been presented with a psychiatric explanation for Mr. Stevens' actions. At the state post-conviction hearing, Dr. Kaplan testified that, at the time Mr. Stevens committed the offense, "he was laboring under dissociative disorder not otherwise specified, borderline personality disorder, and intoxication from LSD and the aftereffects of marijuana," PCR at 2004, and that Mr. Stevens' capacity to make a personal choice at the time of the crime was "nil," *id.* at 2029. Dr. Coons echoed Dr. Kaplan's diagnoses, *see id.* at 1885-86, and also concluded that, at the time of the offense, Mr. Stevens was "laboring under extreme emotional disturbance" and was impaired in his ability both to conform his conduct to the requirements of the law and to appreciate the wrongfulness of his conduct, *id.* at 1891-92. In short, had counsel secured an expert who adhered to mainstream theories within the psychiatric and psychological communities, the expert would have presented evidence establishing the elements of a mental illness defense under Indiana law. *See* slip op. at 13 (quoting Ind. Code § 35-41-3-6).

Given this evidence, I believe that there is *at least* a reasonable probability that, had the jury been privy to this evidence, its result would have been different. I must respectfully register my disagreement with the principal opinion that, in these circumstances, there is a fundamental difference between mounting an insanity defense and establishing statutory mitigating factors for purposes of

capital sentencing. *See* slip op. at 22. Here, the experts not only presented evidence that could establish that Mr. Stevens was operating "under the influence" of a mental disease at the time of the murder—a mitigating factor under Indiana's capital sentencing law, *see* Ind. Code § 35-50-2-9(c)(2), but also that he was "unable to appreciate the wrongfulness of the conduct at the time of the offense"—a defense to the crime, *see* Ind. Code § 35-41-3-6.

Additionally, I believe that the principal opinion over-states the downside to presenting a mental disease defense during the guilt phase. The principal opinion states that "[t]he strategic reasons that might, at a stretch, have justified this decision at the guilt phase, fall apart when we consider that at the sentencing phase Stevens had nothing left to lose." Slip op. at 20. As a practical matter, Mr. Stevens had nothing to lose at the guilt phase. Absent expert testimony that, at the time of the killing, Mr. Stevens' actions were caused by a mental disorder and he was unable to control his actions, the jury was left with no other alternative than to conclude that Mr. Stevens not only chose to engage in predatory pedophilia, but also that he willingly disposed of his victims as dictated by his own interests.

### 5.

Furthermore, even if the decision of the Supreme Court of Indiana, either by itself or in conjunction with the post-conviction trial court's decision, *see Stevens*, 770 N.E.2d at 749 n.5, could be construed as reaching *Strickland*'s prejudice prong, I could not join the principal opinion's conclusion that the decision of the Supreme Court of Indiana was a reasonable one. The expert testimony during the post-conviction hearing shows that Mr. Stevens' upbringing was "a recipe for developing someone with a dissociative disorder." PCR at 2020. Both experts testified

that this disorder, in conjunction with Mr. Stevens' other infirmities, caused him to kill Zachary and prevented him from recognizing the wrongfulness of his actions. Additionally, Dr. Kaplan explained how the nature of Mr. Stevens' disorders and the events leading to the killing of Zachary were inconsistent with premeditation. Because the testimony of competent experts would have explained Mr. Stevens' actions in terms of his mental illness and also would have diminished the impact of any inculpating evidence of premeditation, I do not believe that a determination that Mr. Stevens was not prejudiced by his counsel's lapse of judgment could be characterized as a reasonable one.

## Conclusion

For the foregoing reasons, I not only would grant Mr. Stevens habeas relief with respect to his sentence, I also would grant the writ with respect to his conviction. On this ground, I respectfully dissent in part from the judgment of the court.

MANION, *Circuit Judge,* concurring in part and dissenting in part. I join the opinion of the court as to part II-C regarding the claims concerning the stun belt and discovery issues. I concur with Judge Wood in denying habeas relief from the conviction, but write separately to explain my agreement with the state court's reasoning. I respectfully dissent from the granting of habeas relief for the

death penalty sentence because I conclude that the state court's decision denying collateral relief did not include unreasonable determinations of the facts and was not contrary to or an unreasonable application of Supreme Court precedent.

In May 1993 Christopher Stevens was released on probation from the Marion County jail in Indiana where he had been serving a sentence for child molestation. He moved in with his father, whose home was in the same subdivision as that of ten-year-old Zachary Snider's family. In the early summer, Stevens attended and videotaped one of Zachary's Little League games and later, with his father's permission, took Zachary fishing. Stevens's relationship with Zachary culminated in sexual contact with him. Because a fuller recitation of the facts is significant to evaluating and understanding the Supreme Court of Indiana's decision, the following is a portion of that court's factual findings:

> In the videotaped confession . . . Stevens told the officers that on Thursday, July 15, Zachary visited Stevens in the early afternoon, but stayed only for a short time, saying that he would return after he had picked up some money, talked to his father, and changed his clothes. When he returned, Zachary and Stevens talked for a while as Stevens flipped through the channels on his television, and then the two went to Stevens' bedroom and "messed around," which mainly included the two performing fellatio on each other but never anal sex. This activity was not new to the pair, as they had had an ongoing sexual relationship since shortly after Stevens returned to Stardust Hills after serving his time in the Marion County jail. After they "did stuff for awhile," Zachary angrily confronted Stevens with a rumor he had heard concerning Stevens having sexual relations with Zachary's mother. Because of this rumor, Zachary threatened to

reveal Zachary and Stevens' sexual relationship to his parents. This threat made Stevens "real scared." He stated,

> He said, he, he threatened to tell . . . about me and him, and, uh, I'd just went through a bunch of [expletive] in Indy, and that was just, just on my mind. I was like, I just didn't want to, thinking to myself, you know, I just can't go through all that [expletive] again.

After Zachary's threat, the two "messed around some more," which Stevens again stated meant "having sex." Once finished, Stevens led Zachary by the hand into his brother's room and the two got onto the bed. Stevens took one of his brother's pillows and placed it over Zachary's face in an attempt to suffocate him. Zachary did not really resist; rather, "he just kept sayin' I love you, Chris; I love you, Chris.'" Because the pillow "wasn't doing anything," Stevens looked around the room and noticed a Sega Genesis controller on the floor. He picked it up and, using the cord, wrapped it around Zachary's neck, at first just once but then two or three times, and strangled the boy. When Stevens "thought it was all over," he removed the cord from Zachary's neck and proceeded to pace back and forth between Stevens' brother's bedroom and his own room looking at Zachary's body and contemplating what he would now do.

About five minutes later Zachary, while still unconscious, began to take deep breaths. So, Stevens said, "I went [into my kitchen] and got a trash bag and put it over his head and wrapped it around his head, he was unconscious so, you know, I knew he wouldn't be ripping it off his face and stuff." Once the child had suffocated, Stevens carried Zachary from his brother's bedroom into his own room and laid the boy's body on his bed. Stevens later revealed to a psychologist

for the defense that he killed for fear of having to return to prison brought on by Zachary's threat to tell.

Stevens then went out to the garage, pulled a trailer, lawn mower, and grill onto the driveway to make room for his car, brought his car into the garage, and shut the garage door. He then placed Zachary's bike[1] in the back of the car, went in and got Zachary's body and placed it also in the back of his car, and then covered them both with a cover. Stevens then described in detail how he drove out into the country and threw Zachary's body and bike over a bridge, naming the roads he took to reach the remote location. Initially, the bike got caught in a tree "where anybody could see it if they walked by or drove by," so Stevens "jumped down there" and pulled both Zachary's body and bicycle beneath the bridge. In relating his state of mind during the murder and immediately thereafter, he described himself as "nervous and scared," "all frantic" and "not really thinking."

Once home, Stevens telephoned Mark White to request help in pushing the trailer in his driveway back into his garage. After White assisted Stevens and left, Stevens placed the mower and grill back in the garage, and went back inside his house. Later that evening, Stevens took a can of Lysol and sprayed down his car, the cover used in the car to conceal the body and bike, and his and his brother's beds. He also played basketball with White, during which time he saw the Sniders driving around the neighborhood looking for Zachary. When he and White finished playing basketball, Stevens called Mrs. Snider to learn the status of their

---

[1] [Footnote in original.] Zachary's bike was already in the garage because, Stevens stated, "whenever he comes over I have him put his bike in the garage [. . . ] so [ ] nobody will see his bike there."

search for Zachary, but did so under the guise of inquiring about some rock concert tickets. During this call, Mrs. Snider asked if Stevens had seen Zachary that day, to which Stevens said, "No." Mrs. Snider then revealed that Zachary was missing, and Stevens offered to help them look. Mrs. Snider replied that she would call him if they needed his help. Although she never called back, Stevens went over to their home just before 9 p.m. As he talked with Mrs. Snider, he saw a policeman arrive and walk up the Sniders' driveway. Because Stevens "didn't want to be around the cop," he told Mrs. Snider that he would "go check a couple of places" and quickly departed. Stevens then went to various houses asking the occupants if they had seen Zachary.

Later that night Stevens returned to Zachary's body because he recalled leaving the plastic trash bag wrapped around Zachary's head. Stevens stated, "I went back out there to get the trash bag cause, I figured if you guys [the police] seen the trash bag and looked in our house and seen the same kind of trash bags and, and stuff." Stevens described the trash bag as one with handle ties, green outside and black inside. Upon recovering the bag, Stevens drove away from the scene and, after traveling some distance, threw the bag out of his window. Upon returning to Stardust Hills he again went to the Sniders' house and inquired whether they had heard anything yet, telling them he was up at that late hour because he was having trouble sleeping.

After the confession, the police searched for the trash bag mentioned by Stevens. They found one matching Stevens' description on the side of the road about a mile from where the body was located. While other bags observed during their search all contained trash, this one contained only road dust and debris, and

appeared to have "at one time contained something that caused it to be stretched out," Later that same day, pursuant to a search warrant, police found similar trash bags and a Sega Genesis video game and controllers in Stevens' home.

The body found by police under the bridge was later identified through dental records as that of Zachary Snider. Also, Mr. Snider later identified the bike found with the body to be Zachary's. The pathologist who performed the autopsy, though unable to determine the cause of death because of the state of decomposition, observed no evidence inconsistent with death by either strangulation or suffocation. He found no broken bones and no evidence of any penetrating injury to the torso or lower extremities. When asked about the potential for a natural cause of death, the pathologist replied that the tissues of the heart, lungs, liver, and kidneys available for examination showed no signs of disease. The forensic entomologist who examined insect samples found in the body and in the soil under the bridge placed the time of death sometime between noon and sunset on July 15.

*Stevens v. State of Ind.*, 691 N.E.2d 412, 418-19 (Ind. 1997) (internal citations to the record omitted). Stevens was charged with first degree murder, and trial preparations and proceedings followed. The principal issue in this appeal involves the expert testimony of a psychologist, Dr. Lawrence Lennon. Dr. Lennon did not testify at the guilt phase of the trial, only during the penalty phase and at sentencing. Stevens claims that his counsel was ineffective at both the guilt and penalty phases for retaining only Dr. Lennon, whom Stevens characterizes as an inadequate and prejudicial expert. The state court denied post-conviction relief on this basis.

To obtain habeas corpus relief in this court under AEDPA, Stevens must show that the state court's deter-

mination was contrary to or an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. Central to this appeal is the familiar case of *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate both constitutionally deficient performance and prejudice. In ineffective assistance of counsel claims, this court has explained that,

> [if] a state court has denied a *Strickland* claim on the merits, under the AEDPA we generally review for clear error. As we noted in *Holman v. Gilmore,* "*Strickland* calls for inquiry into degrees; it is a balancing rather than a bright-line approach . . . . This means that only a clear error in applying *Strickland*'s standard would support a writ of habeas corpus." 126 F.3d 876, 881-82 (7th Cir. 1997). This is because "*Strickland* builds in an element of deference to counsel's choices in conducting the litigation [and] § 2254(d)(1) adds a layer of respect for a state court's application of the legal standard." *Id.*

*United States ex rel. Bell v. Pierson,* 267 F.3d 544, 557 (7th Cir. 2001) (emphasis added). We therefore review for clear error in the Supreme Court of Indiana's decision.

With respect to *Strickland*'s performance prong, I am not "inclined to believe that [trial counsels'] performance was ineffective," at the guilt stage as Judge Wood's opinion suggests. Ante at 12. Nonetheless, I agree with Judge Wood that the state court did not clearly err in applying Supreme Court precedent regarding the guilt phase of the trial because Stevens was not prejudiced by his counsels' performance. The Supreme Court of Indiana cites the correct standard to evaluate prejudice under *Strickland*, specifically noting that Stevens must demonstrate "that his counsels' errors were so serious as to deprive him of a fair trial because of a reasonable probability that, but

for counsel's unprofessional errors, the result would have been different." *Stevens v. State of Ind.*, 770 N.E.2d 739, 746 (Ind. 2002) (citing *inter alia Strickland*, 466 U.S. at 694). The Supreme Court of Indiana further clarified that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694). Of course, "more than a correct citation is needed to avoid a decision 'contrary to' clearly established federal law." *Burgess v. Watters*, 467 F.3d 676, 683 (7th Cir. 2006). The state court, however, proceeded to apply this standard, concluding that an alternative mental illness defense at the guilt phase "was not without its pitfalls" because this defense

> would have opened the door to the admission of substantial incriminating evidence not otherwise presented during the guilt phase. This evidence included testimony of a witness that, upon the defendant's prior release from jail onto probation for a previous conviction of child molesting, the defendant had declared that he planned to kill his next child molesting victim to avoid returning to jail.

*Id.* at 749; *see also id.* at 753. Furthermore, the Supreme Court of Indiana noted that one of Stevens's post-conviction experts, Dr. Coons, "acknowledge[d] that [Stevens] could appreciate the wrongfulness of his conduct when he took steps to hide Zachary's body." *Id.* at 749 n.5. Based on this additional evidence, the Supreme Court of Indiana noted that Dr. Coons's testimony "would have had little or no effect on the jury's verdict . . . ." *Id.*

Another piece of incriminating evidence that would have come into evidence through the additional mental health experts is a different description of the nature of the sexual encounters between Stevens and Zachary. The state trial court made a finding that the additional psychological evidence altered the nature of the sexual encoun-

ters between Stevens and Zachary. The understanding at trial had been that the molestation was "consensual," but the testimony of Drs. Kaplan and Coons during the state post-conviction hearing reveals a different story. According to Dr. Kaplan, Zachary and Stevens were

> wrestling around as play, and then [Stevens] grabbed his shorts and, well, Zachary I think hit . . . Steven[s]'s penis, and then [Stevens] grabbed his shorts, pulled them down, and at that point, again, you know, he—he had then forced himself on Zachary, made him, you know, suck his penis, and . . . they had sexual relations. And then after the sexual relations were concluded, Zachary told him, you know, "I'm going to tell my mother about what you did to me." And then, again, he saw Zach as the victimizer now.

Kaplan earlier in his testimony provided the following analysis:

> In [Stevens'] mind, he was a seducer of children, not a forced raper of children. So as long as he saw this as what he felt to be consensual, he didn't see anything wrong with it. And that's probably the greatest problem for him with the Zachary murder is that this was the first time he had forced himself on another child and forcibly had sex. And to him, that was very, very incongruent with his concept of who he was and what sexual molestation is.

The Supreme Court of Indiana did not specifically mention the different description of the sexual encounter, but never rejected the trial court's findings and twice stated that additional mental illness evidence "would have opened the door to the admission of substantial incriminating evidence not otherwise presented during the guilt phase." *Stevens*, 770 N.E.2d at 753; *see also id.* at 749. In sum, the state court's determination that Stevens did not suffer prejudice from his counsels' performance at the

guilt phase is not contrary to or an unreasonable applica-
tion of Supreme Court precedent. I therefore agree with
Judge Wood that Stevens is not entitled to habeas relief
from his conviction.

Proceeding to the penalty phase, just as the state court
did not err in upholding the conviction, the state court
similarly did not err in denying relief from the death
penalty sentence. I therefore respectfully disagree with
Judges Wood and Ripple regarding habeas relief from
the death penalty sentence.

The Supreme Court of Indiana concluded that the trial
attorneys "investigated the mental health issues through
the use of Dr. Lennon." *Stevens*, 770 N.E.2d at 755. The
court further quoted with approval the trial court's find-
ing that "'[d]efense counsel's investigation of Petitioner's
mental health and prior use of drugs was reasonable'" and
that defense counsel pursued a "'strategy of portraying the
petitioner as a passive victim of abuse'" at the penalty
phase. *Id.* at 754. Furthermore, the state trial court found
that based on the fuller description of Stevens' relations
with Zachary that the new experts offered, "[t]he jury
would not consider such a violent, voracious predator as
someone deserving a penalty less than death." *See* Stevens
Supp. App. at 65.

In his penalty phase testimony, Dr. Lennon testified
regarding Stevens's emotional immaturity and the impact
of abuse and his mother's use of drugs and alcohol on
Stevens's development. This mitigation testimony was
in addition to testimony from a variety of Stevens's
relatives and individuals who could testify about and
provide documentation regarding his deplorable childhood.
In this case, the Supreme Court of Indiana found that
Stevens's counsel "presented various witnesses and
evidence showing various mitigating circumstances
including his parents' divorce and his living in the homes

of different people while growing up, the defendant's troubled childhood including suffering childhood sexual abuse, his adolescent alcohol and drug use and diagnoses of passive personality, his depression and suicide attempts, and his poor academic performance." *Stevens*, 770 N.E.2d at 753; *cf. Woods v. McBride*, 430 F.3d 813, 825 (7th Cir. 2005) (noting that "[c]ounsel in this case actually presented mitigation evidence during the penalty phase rather than a half-hearted attempt to deflect culpability from the defendant.") (citing *Wiggins v. Smith*, 539 U.S. 510, 515-18, 526 (2003)). In the context of challenging a death penalty sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. The prosecutors argued for three aggravating factors warranting the death penalty, which the jury each found to be proven beyond a reasonable doubt: that the defendant committed the murder by intentionally killing the victim while committing child molestation, that the victim was under the age of twelve, and that the defendant was on probation after a felony conviction. The Supreme Court of Indiana was "not persuaded that the evidence in the record unavoidably points towards an opposite result" from the state trial court's conclusion that counsel were not ineffective. *Stevens*, 770 N.E.2d at 755. Under the deferential standard of AEDPA, this is not a decision that is contrary to or an unreasonable application of Supreme Court precedent.

It is true that Dr. Lennon failed to follow counsels' instructions not to prepare a report, responded to the prosecutor's unexpected question regarding necrophilia, and discussed his unusual form of therapy. He was not a very good witness. Yet, his performance at the penalty phase (his first testimony in the case, since he did not

testify at the guilt phase), does not render Stevens's counsels' performance ineffective. More importantly, the Supreme Court of Indiana's conclusion that counsel performed reasonably is not an unreasonable application of Supreme Court precedent. Therefore it does not follow that the jury or judge "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death" if faced with additional expert testimony presenting the diagnosis of disassociation. *Strickland*, 466 U.S. at 695. Having reviewed the videotaped confession as well as the record, I do not find that the state court's determination was unreasonable. Consequently, I respectfully dissent from granting habeas relief on the death penalty sentence.

A true Copy:

      Teste:

                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*